[L. A. No. 1761.    Department One.—April 4, 1907.]

BYRON JACKSON, Respondent, v. PORTER LAND AND WATER COMPANY (a Corporation), Appellant.

SALE—EXECUTORY CONTRACT — ACCEPTANCE — PURCHASER MAY WAIVE DEFECTS.—Under an executory contract for the sale of personal property, the purchaser is bound to accept it, provided it conforms to the terms of the contract, or, if not according to the contract, he may reject or refuse to accept it. Although the property may not be of the quality or description contracted for, he may, if he so elect, waive the defect, and acceptance of the property offered constitutes such a waiver.

ID.—DUTY OF PURCHASER TO EXAMINE—UNREASONABLE DELAY.—When personal property is tendered or delivered to a purchaser in fulfillment of a contract for the purchase thereof, the duty devolves upon him to make an examination of it for the purpose of determining whether it fills the contract, and if from such examination he finds it does not, he must promptly reject it. This duty of inspection for the purpose of determining whether the property complies with the contract must be exercised within a reasonable time, and what is a reasonable time depends upon the circumstances of each particular case. In the present case, the use by the purchaser for a period of almost two months of an engine which did not have the capacity contracted for, he during all of that period knowing of its want of capacity, and not objecting to it on that ground, operated as an election to accept the engine, and precluded him from claiming that it was not of the character provided for in the contract.

APPEAL from a judgment of the Superior Court of Los Angeles County.    M. T. Allen, Judge.

The facts are stated in the opinion of the court.

Ward Chapman, and J. G. Chapman, for Appellant.

John D. Pope, for Respondent.

LORIGAN, J.—This action was brought to recover the contract price for furnishing and erecting pumping machinery.

The trial court found that the parties entered into a contract on June 2, 1902, whereby plaintiff was to erect on the premises of defendant a pumping plant consisting of a thirty-five actual horsepower Olds distillate engine with a 110-gallon oil tank, together with a horizontal centrifugal pump of a capacity to elevate three hundred and fifty inches of water twenty-four feet high; said plant and all connections to be first-class and connected with defendant's fifteen wells; the plant to be completed within thirty days and guaranteed to perform the work as specified, the purchase price being $3,250; the time provided in the agreement for installing the pumping plant was waived by the defendant; that plaintiff performed all the conditions of the agreement except that he did not erect or furnish a thirty-five actual horsepower engine as provided in the contract, but, on the contrary, the engine erected by plaintiff on said premises and as part of said pumping plant was materially less than thirty-five horsepower; that said engine was not capable of providing the necessary power to raise the amount of water in said contract required; that on the twelfth day of August, 1902, the pumping plant, including the engine, was received by defendant, but was not to be considered accepted till examined by an expert to be called by defendant; that said pumping plant was operated by defendant continuously from the twelfth day of August, 1902, to the seventh day of September, 1902, when an expert called by defendant examined the same and found only a trivial defect in the governor attached to the engine, which was promptly remedied, and thereafter defendant continued to operate said pumping plant in pumping water for its irrigating system until about the fifth day of November, 1902, at which last date defendant discontinued the use of the engine and pump, constituting part of said pumping plant, but did not notify plaintiff that it had done so until somewhere between the fifteenth and thirtieth days of that month; that some time during the latter half of the month of November, 1902, defendant notified plaintiff that the said engine was not of the horsepower provided for in the contract; that during

the entire time defendant was using said pumping plant it knew the engine was not of the horsepower provided in the contract; that after November 5, 1902, when defendant ceased operating said engine and pump, it detached from nearly all of its fifteen wells the horizontal pipe furnished by plaintiff as part of the pumping plant, and which was about sixteen hundred feet in length, and had been laid in an open trench with suction-pipes on each side of said fifteen wells from which the said pumping plant was designed and intended to draw water, but left said sixteen hundred feet of pipe in the trench with openings made by detaching the suction-pipe leading down into the wells, through which openings water from defendant's flowing wells and seepage waters coming into said trench were allowed to enter said pipe, and defendant removed the plug from the lower end of said pipe, so as to permit water to flow through the same into defendant's irrigating system, and thereby continuously supplied water to the customers of defendant from the time when it ceased to operate said engine and pump; that without the knowledge or consent of plaintiff, in October, 1903, defendant caused said engine to be operated by an hydraulic engineer for the portions of two days for the purpose of testing and ascertaining the horsepower of said engine.

In addition the court found that by taking the pumping plant, including the said engine, into its possession on the twelfth day of August, 1902, and by operating the same for a period of nearly three months,—to wit, until the fifth day of November, 1902,—without any notice to the plaintiff of the inefficiency of said machinery, or that the same was not satisfactory, the defendant accepted the said plant, notwithstanding it was not in accordance with the contract.

Upon these findings judgment was rendered in favor of plaintiff for the full amount of the purchase price. This appeal is taken by the defendant from the judgment and the order of the court denying its motion for a new trial.

It is insisted by appellant that the evidence is insufficient to justify the finding that defendant accepted the plant as furnished by the plaintiff, and that the judgment was not warranted by the findings.

The point that the findings were not justified by the evidence is, we think, untenable. The evidence on the question

of acceptance, as upon all the other facts in issue, except
the terms of the contract and the incapacity of the engine
to raise the amount of water required by the agreement,
is conflicting; but there was certainly sufficient evidence to
be gathered from the conflict supporting all the findings
made by the court. It is true that the court was in error
as to some dates mentioned in the findings and in some
minor particulars, but we do not consider that these sub-
stantially affect the sufficiency of the findings.

There was evidence in the case showing that under the
contract between them the plaintiff set up on the premises
of defendant in connection with its irrigating system, a
pumping plant claimed by plaintiff to be of the character
called for in the agreement. The defendant had fifteen wells
to be operated by this plant, and the machinery having been
installed, pipes laid, and connections made with all of these
wells, a test operation of the plant was commenced by the
plaintiff on August 1, 1902. It was provided in the contract
that the plant should be installed by plaintiff in complete
running order, and that he should leave his expert with it
for six days to instruct the engineer of defendant how to
operate the plant, and it was in harmony with this provision
of the agreement and to test the plant that a six days' run
by the expert of plaintiff was commenced on August 1,
1902. The evidence of plaintiff shows that at the end of
that time the engine, pump, suction-pipe, and other connec-
tions worked perfectly, and that the only difficulty which
arose with the machinery during that period, but which was
overcome, was in the circulating pump, the pulley of which
had to be changed several times. The run during these six
days, however, demonstrated that the engine furnished and
operated by plaintiff as part of the plant was not of thirty-
five actual horsepower as provided in the contract, but of
very much less power; that it was incapable of raising the
quantity of water called for and incapable of raising more
than a little over one fourth of the amount. This was
known to the defendant at that time. After this run of six
days, plaintiff saw the superintendent of the defendant
company and told him that the plant had been run six days
and was all right. The superintendent insisted that it
had not been run six days without touching the plant, and

that plaintiff would have to have his expert run it another six days. This plaintiff did, commencing on August 6th, and ran it to the twelfth day of August; the engine, pump, and connections worked perfectly, but this operation still demonstrated that the engine was incapable of lifting a greater quantity than previously pumped. On August 12, 1902, plaintiff again sought the superintendent of defendant and asked him to accept the plant or take it under his charge. The superintendent said that the plaintiff could turn the plant over to him, but as to acceptance replied, ''that he would have his own expert go out to the plant at some future time—at some time in the near future, immediately—and look over the ground and see if all the conditions of the contract were fulfilled.'' Plaintiff immediately turned the plant over to defendant, whose engineer thereafter, and while it was in operation, handled it. About August 26, 1902, while the engineer of defendant was operating the plant, some trouble with the pump was reported to plaintiff, who sent a man out to inspect it. He found that for lack of oil the babbitting had melted and stuck onto the shaft of the pump; the shaft was taken out, repaired, and placed back.. Thereafter, and towards the end of August, 1902, defendant engaged an expert and sent him out to the plant to examine it. The expert made the examination and made a written report to defendant, stating that he had examined the pumping plant, ''and found it to be in good working order, with the exception of the gas engine, that is out of adjustment. When this is adjusted I think the plant will work satisfactorily.'' This expert, called as a witness, testified that the adjustment of the engine referred to in his report had relation to the governor on the engine, which needed repairing. Plaintiff having been notified that the governor needed adjustment, sent on September 6, 1902, one of his machinists to see what was at fault. He examined the engine, and on the trial testified that he found the distillate they were using in the engine was very poor; that it tended to cause the electrodes—that is, the sparking-points—to become corroded in a very short space of time; that it was so with the engine he was examining; that when he came back from the inspection he sent out another electrode. The

court was warranted from the evidence in finding that these two matters—the corroding of the electrodes and the babbitting of the pumping shaft—were the only faults found in the perfect operation of the machinery; that they were not incident to any defects of the machinery itself, but the result of either a use of poor distillate, or proceeded from carelessness or want of familiarity on the part of defendant's engineer with the operation of this make of engine installed by plaintiff; that these were the only matters affecting the operation of the engine which were called to plaintiff's attention; were trivial and promptly remedied; and hence the court was justified in finding that all the conditions of the contract with plaintiff save as to the capacity of the engine to be furnished were performed.

Referring to the findings in the light of the evidence thus far recited, it is apparent that the court was in error in finding that the examination of the pumping plant by the expert of defendant was made on September 7, 1902,—it is apparent from the date of the expert's report to defendant that it was as early at least as August 29, 1902; and the finding that a defective governor on the engine was repaired—it apparently was a defective electrode; but these are immaterial errors, and we mention them only because appellant refers to them.

Proceeding now to a further consideration of the evidence. It shows that aside from these defects referred to no complaint of the operation of the pumping machine was made to plaintiff; that from the time the plant was received by the plaintiff, on August 12th, though not then accepted, and from the time the expert of defendant reported upon it, towards the end of August, 1902, down to October 5, 1902, the plant was operated by the engineer of defendant, was used in the business of defendant in pumping water for its irrigation system, with full knowledge on the part of the defendant that it was not nearly the horsepower capacity which plaintiff had contracted to furnish, and was not and could not be operated so as to lift the amount of water it was agreed it should; that with this knowledge of its incapacity to perform the work the defendant used it to pump such water as its capacity would furnish, and at no time during that period while it was so using it

made any objection or complaint that it was not as contracted for, nor notified the plaintiff that it would not be accepted until long after October 5, 1902, the date when the engine and pump were received by defendant.

Defendant, it is true, contends that during all this period it was experimenting with the plant, and endeavored to make the plant work successfully. But as there was evidence that at the first test, with the machinery working perfectly, it was demonstrated that the engine did not have nearly the capacity contracted for, it is apparent that no amount of experimental work could increase such capacity, and it was demonstrated during its entire operation—at the original test, after the defendant had taken it in charge; when its expert reported upon it; and all during the month or more thereafter while defendant continued operating it— that it was incapable of at all pumping the water it was contracted to do. The trouble with the engine was of such a character that no amount of experimenting, repairing, or adjusting of machinery could remedy it. It did not have the horsepower which was contracted for, and there was nothing that could be done with it to give it that power. It was impossible to have it operate to the capacity it was agreed it should. The only remedy for this defect was to remove the engine and obtain another that did have the requisite horsepower. Defendant knew this from the very start—the very first test—and when it continued to use and operate the plant with this engine, particularly for over a month after it had sent its expert to examine and report on it with a view of either accepting or rejecting it, and with knowledge that the engine could not possibly develop the horsepower agreed to, and without any notice to plaintiff that the engine was insufficient or unsatisfactory, or that it would not be accepted, the court was justified in finding from the evidence that defendant had, in fact, accepted the engine, notwithstanding it was not in accordance with the contract.

It is true that the court was in error in finding that the defendant actually used the engine and pump up to November 5, 1902. The insertion of the month of "November" was probably a clerical error. The evidence showed they were used up to October 5, 1902, when defendant removed

them. However, we think this is not a material error. Eliminating dates, and leaving the finding stand as a general one of acceptance of the plant, it is still sustained by the evidence.

And the finding that defendant accepted the plant, though not as contracted for, being sustained by the evidence, the judgment rendered for plaintiff was proper.

The rule is elementary as to the respective rights of the parties under an executory contract for the sale of personal property. As to the purchaser he is bound to accept the property, provided it conforms to the terms of the contract, or, if not according to the contract, he may reject or refuse to accept it. Although the property may not be of the quality or description contracted for, he may nevertheless, if he so elect, waive the defect, and acceptance of the property offered constitutes such a waiver. When personal property is tendered or delivered to a purchaser in fulfillment of a contract for the purchase thereof, the duty devolves upon him to make an examination of the property tendered or delivered for the purpose of determining whether it fills the contract, and if from such examination he finds it does not, he must promptly reject it. This duty of inspection for the purpose of determining whether the property complies with the contract must be exercised within a reasonable time, and what is a reasonable time depends upon the circumstances of each particular case.

Applying these general rules to the matter at bar. The engine to operate the pumping plant was to be of a certain description and of certain specified effective power, to be installed and put in running order by plaintiff. He furnished an engine and plant and put it in running order. This did not vest the title in defendant; it was not required to accept the engine unless it conformed to the contract. This could only be determined upon trial. Upon trial as early as August 12, 1902, it was demonstrated that the engine was absolutely incapable of pumping the quantity of water stipulated for, and as early as that date defendant knew it. It was the duty of the defendant after such demonstration to then act promptly and refuse to accept the engine. Instead of doing this, it went on using the engine in the regular conduct of its business, and for its own advantage, for al-

most two months before it notified plaintiff that it would not accept it. This was not only not acting promptly, but it was an unreasonable and unwarranted delay amounting to an election to accept the engine, though it was not of the capacity which had been contracted for. And the defendant having thus accepted the engine, was precluded from claiming that it was not of the character provided for in the contract, and plaintiff was entitled to a judgment for the purchase price as if the engine contracted for had actually been installed.

As generally sustaining these views, we cite *Reed* v. *Randall,* 29 N. Y. 358, [86 Am. Dec. 305]; *Boughton* v. *Standish,* 48 Vt. 595; *McBride* v. *McClure,* 49 Ill. App. 612; *Boothby* v. *Scales,* 27 Wis. 262; *Tufts* v. *Mabie,* 7 Kan. App. 129, [53 Pac. 766]; *Brown* v. *Foster,* 108 N. Y. 387, [15 N. E. 608]; *Palmer* v. *Banfield,* 86 Wis. 441, [56 N. W. 1090]; *Carleton* v. *Jennings,* 80 Fed. 937, [26 C. C. A. 265]; 24 Am. & Eng. Ency. of Law, 1093.

The judgment and order appealed from are affirmed.

Henshaw, J., and McFarland, J., concurred.

Hearing in Bank denied.