[Civ. No. 1813. Third Appellate District.—July 29, 1918.]

G. NELLIGAN et al., a Copartnership, etc., Respondents, v. K. KNUTSEN, Appellant.

SALE OF EGYPTIAN CORN—PREVENTION OF PERFORMANCE—DESTRUCTION OF CORN—INSUFFICIENCY OF EVIDENCE.—In this action for breach of contract for the sale of Egyptian corn, the evidence is held insufficient to show that the seller was prevented from fulfilling the contract by reason of the destruction of the corn contracted to be delivered.

ID.—IMPOSSIBILITY TO PROCURE CORN FROM EXPECTED SOURCE—DUTY OF SELLER.—Where a seller makes an unqualified contract to sell a specified amount of corn of a certain quality, expecting to obtain the same from growers, the impossibility of obtaining the corn from them does not excuse nonperformance, it being his duty in such a case to go into the market and procure the corn.

ID.—ACCEPTANCE OF INFERIOR QUALITY — WAIVER.—Where, under a contract for the sale of corn, the buyer accepts corn of an inferior quality to that called for by the terms of the contract, such acceptance constitutes a waiver of the defect in the quality.

APPEAL from a judgment of the Superior Court of Stanislaus County. W. H. Langdon, Judge.

The facts are stated in the opinion of the court.

Wm. N. Graybiel and E. H. Zion, for Appellant.

R. R. Fowler and James L. Crittenden, for Respondents.

HART, J.—The complaint alleges: That plaintiffs are partners under the firm name and style of Nelligan & Son, doing business in the city of Santa Rosa, and that defendant is a resident of the county of Stanislaus; that on or about the eleventh day of September, 1916, a written contract was entered into between the parties hereto by which plaintiffs agreed to purchase from defendant and defendant agreed to sell to plaintiffs four thousand five hundred sacks of No. 1 White Egyptian corn for the sum of $32.50 per ton; that, in accordance with said contract, defendant has delivered to plaintiffs 2,250 sacks and that 2,250 sacks remain undelivered; that on or about February 19, 1917, plaintiffs demanded the delivery of said corn, but that defendant has failed and refused to deliver the same; that on said date "and within such period thereafter as would have sufficed for the plaintiffs to purchase the same quantity of Egyptian corn of like quality and kind as specified in said contract, the plaintiffs would have been compelled to pay in the market where delivery of said Egyptian corn was to have been made according to the terms of said contract, to wit, on board cars at Turlock, Stanislaus County, the sum of $942 more than the price for which the defendant promised and agreed to sell said Egyptian corn to plaintiffs," and that on said day, or within a short time thereafter, plaintiffs could have obtained for said corn the sum of $1,305 "more than the price for which the defendant promised and agreed to sell said corn to plaintiffs." Judgment in the sum of $1,305 was prayed for.

The answer admits the execution of the contract and the delivery of 2,250 sacks of corn, but denies that defendant failed or refused to deliver to plaintiffs the balance of the corn; admits demand for the delivery of the balance; denies the allegation of the complaint that plaintiffs, had they purchased corn at Turlock, would have been compelled to pay $942 more than the price agreed upon in the contract, and denies that plaintiffs have sustained any loss. The answer then alleges: That at the time of the execution of the contract referred to "plaintiffs understood that the corn which said defendant had agreed thereby to deliver to said plaintiffs was corn which was contracted to be delivered by several different persons who were growers of the same; that, without any fault or neglect on the part of this defendant," he has received from said

growers only the 2,250 sacks which he delivered; that there was an agreement by plaintiffs that six hundred sacks might be released from delivery by defendant; that before the corn contracted for was harvested there were heavy rainstorms and "that nearly all Egyptian corn that could be obtained was colored and moldy by reason of having been rained upon in the fall; that by reason of the rains aforesaid defendant could not obtain No. 1 White Egyptian corn as specified in said agreement"; that in December, 1916, defendant shipped a carload of corn to the plaintiffs, who rejected one hundred sacks thereof as not being No. 1 White Egyptian corn; that plaintiffs refused to receive corn from defendant between the 12th of December, 1916, and the first of the year 1917, by reason of which "defendant was deprived and prevented while the price was low, namely, the price of $33 per ton, from buying corn outside of that which he had contracted from the growers."

The cause was tried before a jury, and, in accordance with their verdict, judgment was entered in favor of plaintiffs for $850. The appeal is by defendant from said judgment.

Appellant's position is thus stated in his brief: "The appellant and defendant relies as a first defense on the fact that the appellant was prevented from fulfilling his contract by destruction of the thing to be delivered, and in connection with that the court erred in refusing to allow the defendant to introduce samples of the corn that was in dispute, and for a second defense the appellant contends that if he were not released by impossibility of performance, that all the plaintiffs and respondents could recover would be the sum of fifty cents a ton, the difference between the contract price of $32.50 and that of $33, the price that corn of like quality to that which they had accepted could be bought for in the open market at Turlock." Under the last contention it is claimed that $50.75 is the greatest amount of damages plaintiffs could recover, being fifty cents per ton for 141½ tons, or 2,250 sacks.

1. Appellant's contention that he was prevented from fulfilling his contract by reason of the destruction of the corn contracted to be delivered is not borne out by the facts as disclosed by the evidence. The contract was entered into in September, 1916, and thereafter there were heavy rains which caused some damage to the crop. Nevertheless, defendant was able to deliver to plaintiffs 2,250 sacks, which were accepted by plaintiffs as complying with the requirements of the

contract as to quality and grade. The witness, Brooks, manager of the Turlock Merchants & Growers' Association, testified that "there was plenty of corn offered us to purchase at that time (between January 8 and February 26, 1917, upon which latter date the complaint in this action was filed) and we purchased considerable." He estimated that between the dates mentioned the association bought between two hundred and four hundred tons of Egyptian corn No. 1 in and about Turlock.

The above statement of facts brings the case within the rule, stated in *Pearson* v. *McKinney,* 160 Cal. 649, 654, [117 Pac. 919, 921] : "Where one makes an unqualified agreement to sell goods to be delivered at a fixed time, or, on demand of the buyer within a stated period, and it is inherently possible to obtain the goods, the fact that the seller may have expected to manufacture the goods himself, or to procure them from a certain source, and has not been able to complete or obtain them when delivery is due, does not excuse performance. In that event, his contract being unconditional and unqualified, he must go into the market if necessary and obtain the goods, and he will be liable in damages for nondelivery."

Appellant cites the case of *Mineral Park Land Co.* v. *Howard,* 172 Cal. 289], L. R. A. 1916F, 1, 156 Pac. 458], wherein it was held, as stated in the syllabus: "Where performance depends upon the existence of a given thing, and such existence was assumed as the basis of the agreement, performance is excused to the extent that the thing ceases to exist or turns out to be nonexistent." But, in the case at bar, the jury was justified in finding that the corn, the subject of the agreement, had not ceased to exist and that defendant could have performed his contract. (See cases cited in 2 Mechem on Sales, sec. 1103.)

It is contended by appellant that there was no "No. 1 White Egyptian corn" in or about Turlock during the time covered by the contract in question, and he refers to the testimony of H. G. Thompson, a grain broker, who stated that there was no No. 1 corn in the year 1916; that corn was rated as No. 1 1916 corn; "we had a grade this year that we called 'Season's average' corn, and that is the term that we usually used, and you could not specify absolutely No. 1 or No. 2 corn; we simply had to describe it as best we could as being nearly season's average."

From a letter dated December 12, 1916, written by plaintiffs to defendant, it appeared that plaintiffs had rejected one hundred sacks of corn from a carload shipment because it was "moldy corn." It is further stated therein: "We would prefer to have less corn than the contract calls for than to have moldy corn mixed with it." It appeared from the testimony of Morris F. Nelligan, one of the plaintiffs, that the moldy corn complained of was not part of that covered by the contract in question, but was sold by defendant to plaintiffs for $40 per ton.

Plaintiffs accepted all the corn offered them by defendant except the one hundred sacks above referred to and those were rejected because of being moldy. If, as stated by the witness, Thompson, there was no No. 1 corn, but that corn "was rated as No. 1, 1916 corn," and if corn so rated had been accepted by plaintiffs, it must be assumed that they would continue to accept a similar grade of corn from defendant until his contract was fulfilled. And if plaintiffs accepted corn that was inferior in quality to that called for by the terms of the contract, such acceptance constituted a waiver of the defect in the quality. (*Jackson* v. *Porter Land & Water Co.*, 151 Cal. 32, [90 Pac. 122].)

2. On cross-examination this question was asked of the witness, Nelligan: "I want to ask you, Mr. Nelligan, what kind of corn you call that? [Showing Egyptian corn to witness.]" To this question an objection was interposed on the ground that it was immaterial, incompetent, and irrelevant, and any testimony that he might give in connection with the grade of the corn would be absolutely irrelevant and incompetent as to the merits of this action, providing he was willing to accept it. The court asked defendant's attorney what the purpose of the testimony was, to which he replied: "The purpose in the first place is, the contract calls for No. 1 White Egyptian corn; . . . if this was No. 1 White Egyptian corn which the contract calls for, then if that was what Mr. Knutsen, the defendant, agreed to sell him, then he can't compel Mr. Knutsen to sell to him some other grade. . . . In the next place, I want to know if he knows—he testified yesterday to certain grades of corn. If for no other purpose, I got a right to test him on that." The objection was sustained and this ruling is complained of as erroneous.

As heretofore stated, plaintiffs had accepted the corn shipped to them by defendant, and it was immaterial whether or not it was No. 1 corn. The last shipment was made on December 21, 1916; on December 26th plaintiffs wrote defendant: "You can ship the other cars contract corn as soon as you want." On January 8, 1917, plaintiffs wrote a letter demanding the shipment of the balance of the corn, to which, on the 10th of January, defendant replied: "I have no more corn to deliver to you." An oral demand for the delivery of the corn was made by plaintiffs on February 17, 1917. The one hundred sacks which were rejected because moldy formed no part of the "contract corn," so plaintiffs had accepted all of the 2,250 sacks which had been delivered, and they requested defendant to ship the balance.

We hold to have been proper, under the indicated circumstances, the ruling, sustaining the objection to the question as to what kind of corn the samples shown the witness was.

3. The contention that the only amount which plaintiffs could recover as damages for the breach of the contract was fifty cents per ton is equally devoid of merit.

The witness, Nelligan, testified: That, on January 8, 1917, the date when plaintiffs made a written demand upon defendant to fulfill his contract, the market price of corn of like quality as that contracted for and what plaintiffs would have had to pay for it was $41 per ton, and that they could have sold it for $47 or more within a short time after said date, or for a profit of $17 per ton. He said that plaintiffs, relying upon the promise of defendant to furnish corn, had entered into contracts to sell to third parties; that they fulfilled said contracts, purchasing the corn from the Turlock Merchants and Growers' Association, in different lots, in March, 1917; that for one lot they paid $45 per ton, for another $47, and for another $58.

H. Brooks, manager of the Turlock Merchants and Growers' Association, called as a witness for plaintiffs, testified that, from about Christmas, 1916, to February 1, 1917, there was a lull in the market; "the buyers ceased to buy; the bottom dropped out of the market." Witness paid to growers for corn which he bought during that time $33 per ton, and he stated that the market price to anyone who desired to purchase from his concern was $40 per ton.

The witness H. G. Thompson, called on behalf of defendant, testified that, during January, 1917, and until the 1st of February, the price of corn "was in the neighborhood of $33 and $34 per ton to the rancher, f. o. b. cars, at Turlock." On cross-examination he stated that he bought corn about the 20th of December, 1916, at $33 per ton; that there was a general slump in the market during the winter; that the market began to rise about the 1st of February; "that, from the 1st of February on it began to strengthen up and in the middle of February we bought—about the 15th of February—we bought two thousand sacks at $37.50 a ton; . . . it was good No. 1 corn, that is, this year's." The witness stated that, at the time the complaint was filed, February 26, 1917, the price was about $39.50.

The verdict of the jury was for the sum of $850. They evidently agreed upon a price of $38.50 per ton, which, for 141½ tons, would amount to $849. Under the evidence above set out, we must hold that the verdict is sufficiently supported.

Appellant contends that the breach of the contract occurred between the sixth and the tenth days of January, 1917, on each of which dates he wrote letters to plaintiffs stating that he had no more corn to ship, and, as we have seen, plaintiffs wrote, on January 8th, demanding delivery of the balance of the corn. Respondent relies upon the oral demand, made upon February 17, 1917, as the date of the breach. This was a matter for the jury to determine, and, obviously, they selected the latter date as the correct one.

On the theory that the breach of the contract occurred on January 8, 1918, appellant claims that plaintiffs did not "exercise reasonable care and diligence to avoid loss or to minimize the resulting damage," it being contended that they could have purchased corn at and in the neighborhood of Turlock for $33 per ton. But, as the jury found that the breach did not occur until February 17th, the rule invoked does not apply, there being but nine days between that date and the date of the filing of the complaint.

The judgment is affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on August 27, 1918, and the following opinion then rendered thereon:

THE COURT.—In his petition for a rehearing, appellant, among other points therein made, declares that, in reaching our conclusion as announced in the original opinion, we considered the testimony of Nelligan as to the price at which corn could be sold in Santa Rosa. In reply, we take occasion to say that we based our decision solely upon the proposition that the record contained sufficient evidence to support the verdict in all vital particulars growing out of the issues made and tried, and that, although we referred in our opinion to the testimony relative to the price at which corn could be sold in Santa Rosa, we attached no significance thereto so far as the verdict was concerned. That testimony was by the court taken from the jury in an instruction in which they were told in explicit terms not to regard or consider it in reaching their verdict, and the presumption is that they obeyed the instruction and disregarded the testimony.

As to the remaining grounds upon which a rehearing is asked, we are satisfied with our original opinion, and a rehearing is, therefore, denied.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 27, 1918.