[Civ. No. 7650.  Second Appellate District, Division One.—June 28, 1933.]

LYDIA PIGOTT, Respondent, v. L. G. CLARK, Appellant.

Bernard Potter for Appellant.

Raphael Dechter and Wendell Mackay for Respondent.

DESMOND, J., *pro tem.*—Plaintiff recovered judgment in the sum of $1652.48 which the trial court found to be the balance due on certain promissory notes which had been transferred by one Mitchell to the plaintiff, the judgment also carrying costs.

The defendant appeals, not questioning the correctness of the amount which the court found was unpaid, but contending that no part of it is due or owing, claiming specifically that there is insufficient evidence to justify the decision, or particularly one of the findings numbered XIII, which is hereinafter set forth.

The defendant, a veterinarian by profession, was the owner of an oil-well in the Alamitos Heights field. His superintendent, Howard Murchie, an oil man of many years' experience, purchased in December, 1927, some 2½-inch upset tubing from Alfred W. Mitchell, doing business as Coast Supply Co. Mitchell had a 5-acre lot on which he kept pipe, tubing and other supplies. The tubing was kept in piles and the particular lot in question was selected by Murchie. It appeared at the trial that various kinds of tubing are used in oil operations, among them ''Reading'', ''D B X'' and seamless steel tubing. ''Reading'' is an iron tubing, but, according to the testimony, the difference be-. tween iron and steel would not be discernible unless the tubing were cleaned and wiped off. The bill of exceptions before us does not indicate that Murchie appeared as a witness at the trial. Mitchell testified that Murchie selected the tubing after he examined it in the pile where it was placed on the Mitchell lot and accepted it, about a month before Dr. Clark called at the Coast Supply office and made settlement for the tubing by giving his promissory notes. It appears that no trouble was experienced with any of the tubing until October or November of 1928, almost a year after its purchase. At that time the tubing was ''pulled'' from the well and, according to defendant's testimony, it

was found then that the tubing that had been delivered was of two kinds, "Reading" and seamless steel. During the year 1929 the tubing was pulled approximately a dozen times. Whenever the tubing was pulled, it was found that joints of "Reading" had split, but the seamless steel tubing was intact. Finally, all the "Reading" tubing was replaced with seamless steel, no further trouble developing thereafter. Defendant set up a counterclaim by way of an affirmative defense claiming reimbursement in the sum of $526.51 for the replacement of the "Reading" joints and $1,000 for lost production resulting from delay and inability to pump the well while the pulling operations were under way. Dr. Clark testified that when he signed the notes he said to Mr. Mitchell: "That tubing is supposed to be real good used tubing, isn't it, steel seamless tubing?" And that Mitchell answered, "Yes". Further conversation according to Dr. Clark was as follows: "You know I don't know anything about this oil business, and my superintendent tells me it is good stuff, and I am asking you if it is good stuff." To which Mitchell replied: "It is absolutely as good stuff as I ever saw; steel seamless tubing." Mr. Mitchell, on the other hand, said on the witness-stand: "Dr. Clark wanted to give notes for it. Not a word was said about seamless tubing to my recollection. Not a word was said about tubing." Mitchell also testified that "the average length of life for tubing, in wells in the Alamitos Heights is six months to twelve months, some of them longer"; saying also that there would be less wear on the tubing by friction of the rods in a straight hole than in a crooked well. It also appeared from testimony of one of the plaintiff's witnesses, B. H. Graham, a dealer in oil-well supplies for 12 or 14 years, that the average life of new tubing in the Alamitos Heights field is approximately a year. This witness testified that "Reading" tubing is not used any more in the present day deep wells, "unless there were certain water conditions that would warrant them using it". This "because they have seamless tubing now that we didn't have four or five years ago". There was evidence that "Reading" tubing is used in preference to steel where subterranean acid conditions prevail, and that it commands a price about 20 per cent higher than steel tubing. As will be seen from the above-quoted portion of Dr. Clark's testimony,

the tubing purchased by his superintendent Murchie from Mitchell was not ·new, but used tubing. In regard to it Mitchell testified as follows, according to the bill of exceptions: ''If we got a string of tubing we thought was good we put it in a good pile and sold it. I didn't know whether that was Reading or steel tubing when it was sold. Maybe I would not know, maybe I would, but I don't remember now. Mr. Murchie is an old time oil man, the same as myself.'' He also testified: ''Reading has lettering on the side, D B X has it on the collar, and seamless has it on the side. It is easy to distinguish it if you wash it off and look for it.''

Finding XIII to which appellant excepts reads as follows: ''That all and singular the allegations of the first and separate affirmative and distinct defense and counterclaim are untrue, and the court specifically finds that there was no valid agreement extending the time of payment of the promissory notes as alleged in said answer; that court further specifically finds that no representations were made at the time of the purchase of the tubing in the counterclaim set forth of any kind whatsoever and that said tubing was purchased through the superintendent of the defendant, who was duly authorized by said defendant to make said purchase; that said tubing was examined by said superintendent of defendant and defendant accepted and used said tubing after an inspection and acceptance by the defendant through his superintendent.''

██ This finding effectively disposes of the defendant's counterclaim and on the facts disclosed by the transcript some of which are recited above, properly so, in our opinion. Defendant had abundant opportunity to examine the tubing, for it was used in his well, placed there joint by joint by his superintendent. If there were any question in the mind of the superintendent as to whether any particular joint were iron or steel it could have been answered very easily by washing the pipe. It appears quite definitely that Mr. Murchie either knew that some of the tubing was ''Reading'' and was satisfied to use it, or that he considered the character of the tubing of so little consequence that he did not even have the joints cleaned to determine whether they ·were iron or steel. It may be noted also that at least some of the iron joints lasted for almost a year and further that,

according to Mr. Mitchell, "Dr. Clark never complained about the character of the tubing until a week ago when we had this suit, when I read the complaint. That was the first time I ever knew there was any complaint about the tubing."

In support of this appeal, defendant cites section 1767 of the Civil Code as it was in effect at the date of this transaction, reading thus: "One who sells or agrees to sell personal property, knowing that the buyer relies upon his advice or judgment, thereby warrants to the buyer that neither the seller, nor any agent employed by him in the transaction, knows the existence of any fact concerning the thing sold which would, to his knowledge, destroy the buyer's inducement to buy."

A mere reading of this section demonstrates that it is inapplicable to the present situation for there was no evidence that at the time the tubing was purchased the buyer relied upon Mr. Mitchell's advice or judgment; as a matter of fact, he undoubtedly relied upon the advice and judgment of his own superintendent.

The allegation of the express warranty as to the character of the tubing set up in the affirmative defense was effectively refuted in the opinion of the trial court by the testimony of the witness Mitchell, directly conflicting with Dr. Clark's testimony on that subject. This is a finding upon a question of fact which under the Constitution we have no power, and under the circumstances of this case, no inclination to disturb. There is no testimony in this case as to any representation or undertaking by the seller of the tubing at the time Murchie, the superintendent, purchased it. We know nothing about that transaction beyond the fact that he bought a certain amount of pipe from a pile which he examined and accepted as satisfactory for his own purpose. There is no testimony even of any statement being made as to the use to which it was to be put. Let us here consider the law as expounded in the syllabus of *Jackson* v. *Porter Land & Water Co.,* 151 Cal. 32 [90 Pac. 122]: "When personal property is tendered or delivered to a purchaser in fulfillment of a contract for the purchase thereof, the duty devolves upon him to make an examination of it for the purpose of determining whether it fills the contract, and if from such examination he finds

it does not, he must promptly reject it. This duty of inspection for the purpose of determining whether the property complies with the contract must be exercised within a reasonable time, and what is a reasonable time depends upon the circumstances of each particular case. In the present case the use by the purchaser for a period of almost two months of an engine which did not have the capacity contracted for, he during all of that period knowing of its want of capacity, and not objecting to it on that ground, operated as an election to accept the engine, and precluded him from claiming that it was not of the character provided for in the contract.''

Judgment affirmed.

Houser, Acting P. J., and York, J., concurred.