## Thomas C. Millard, Trustee in Bankruptcy, *vs.* William G. Green et al.

First Judicial District, Hartford, March Term, 1920.

Prentice, C. J., Wheeler, Beach, Gager and Case, Js.

A resulting trust is based on intention presumed or implied from the circumstances of the transaction; but a constructive trust arises *in invitum* for the purpose of working out justice in the most efficient manner, generally in cases involving fraud or wrongdoing of some kind.

An officer of a corporation who uses its funds without authority to buy stocks in his own name and for his own personal use, will be treated by a court of equity as holding them under a constructive trust for the use and benefit of the corporation.

The continued existence of a constructive trust and the equitable property-right of the real owner is not affected by his solvency or insolvency.

A pledge of stocks to a bank as collateral security for the officer's own personal pre-existing debt, will not defeat the right of the corporation's trustee in bankruptcy, shortly thereafter appointed, to recover the stocks so pledged for the benefit of the creditors of the insolvent company, if the bank did not, at the time of receiving the stocks, part with any valuable consideration, or alter its legal condition for the worse. Under such circumstances the bank does not become a bona fide purchaser for value, and acquires no more beneficial interest in the stocks than the pledgor himself had. Nor would the title of the bank prevail, even though the pledge to it had been made by assignment and power of attorney executed in blank, instead of by merely delivering the securities to it.

A certificate of stock is not a negotiable instrument, and the rules of law governing the transfer of negotiable paper as security for a pre-existing debt, do not apply to a delivery of stock certificates as collateral.

One who has suffered no loss from taking stock certificates as collateral, is in no position to invoke the doctrine of estoppel.

Laches as a defense is available only where there has been so long a delay in the assertion of a claim as naturally to prejudice the one against whom it is made.

The case of *National City Bank* v. *Wagner*, 132 C. C. A. 533, 216 Fed. Rep. 473, criticised and distinguished.

Argued March 2d—decided May 7th, 1920.

ACTION to secure a transfer to the plaintiff, the trustee in bankruptcy of the New Milford Hat Company, of certain shares of stock and of bonds, alleged to have been purchased by the defendant Green with funds of the Hat Company, and thereafter pledged by him to the defendant bank as collateral for his own personal indebtedness of long standing, and for other equitable relief, brought to and tried by the Superior Court in Litchfield County, *Kellogg, J.;* facts found and judgment rendered for the plaintiff, and appeal by the defendants. *No error.*

*William F. Henney,* with whom was *John F. Addis,* for the appellants (defendants).

*J. Moss Ives* and *Frederick H. Wiggin,* for the appellee (plaintiff).

GAGER, J.　This action is brought by the trustee in bankruptcy of the New Milford Hat Company to recover certain stock standing in the name of the defendant W. G. Green, bought by him with the funds of the Hat Company and by him pledged to the First National Bank of New Milford to secure his personal indebtedness to the bank.

Two questions arise upon the record: first, did the defendant W. G. Green hold the securities hereinafter described in his own right, or as trustee for the New Milford Hat Company? Second, if Green held these securities as trustee for the Hat Company, did his pledge of the securities to the defendant bank give the bank a claim superior to that of the Hat Company or its trustee in bankruptcy?

The essential facts with reference to the first question are these: S. S. Green, a brother of W. G., was majority stockholder, treasurer and active financial officer of

the Hat Company; W. G. Green was a stockholder and assistant treasurer, and one Barnes, an uncle of the Greens, was a stockholder and president. These three owned all the stock. From the beginning the Greens were borrowers from the Hat Company and made advances to and kept ledger accounts with the company, the balances appearing upon these accounts fluctuating from one side to the other from time to time. W. G. Green's ledger account was not accurate, and when accurately stated showed that he was in fact heavily indebted to the Hat Company at all times during the transactions on which this suit is based. Between 1905 and 1909 W. G. Green bought with funds of the Hat Company, in four blocks at different dates, one hundred and two shares of the capital stock of the New Milford Water Company, and took title in his own name. Between 1907 and 1912, Green also bought with the funds of the Hat Company, in six blocks at different dates, forty-one shares of the First National Bank of New Milford, and took title in his own name. He also bought three shares of stock and three bonds, of the New York Realty Owners, in the same way. In these purchases Green had no intent or purpose to make investments for the Hat Company. The title to these stocks remained in W. G. Green, and they were in his possession and control until they were hypothecated by him to the bank as will be described later. The funds of the Hat Company, used by W. G. Green in the purchase of these stocks, were never charged to his account upon the books of the company, nor did it appear in what way he obtained the funds. He was credited with interest and dividends therefrom. Why he was so credited does not appear otherwise than that he was at all times in debt to the Hat Company. At all times when said stocks were bought by W. G. Green, his brother S. S. Green, treasurer and financial manager

of the Hat Company, had full knowledge of these stock purchases. The Hat Company became insolvent between 1907 and 1915, but the expert accountants were unable to ascertain at what time between these dates the insolvency occurred. The Hat Company filed its voluntary petition in bankruptcy May 26th, 1915, and was adjudged bankrupt on July 2d, 1915, when the plaintiff became trustee.

This statement of facts unmistakably shows a case where a subordinate financial officer of a company uses funds of the company to buy stocks in his own name, with no intention or purpose to make investments for the company and without authority or direction of the company or of any superior officer. This situation makes the officer so buying these stocks a constructive trustee of these stocks for the company. The statement of the finding is brief, but comprehensive and conclusive, that he used the funds of the company not for its purposes, but to buy stocks to hold and use for himself. There is no suggestion from the books or elsewhere of a loan or a gift to W. G. Green of the funds used in purchasing the stocks, nor any disclosure of the methods by which W. G. Green gained control of the Hat Company funds, other than can be implied from his fiduciary position as assistant treasurer. The mere fact that S. S. Green, treasurer of the company, knew of this transaction, is not sufficient of itself to qualify the effect of the finding as to the use of the funds. In the absence of any explanation, the legal interpretation of the finding admits of but one conclusion, as just stated: that W. G. Green became constructive trustee for the Hat Company. Whether the Hat Company was a family concern or not, and whether at the time of the purchase of the stocks it was solvent or insolvent, is immaterial. On the finding, he used the funds of the company intentionally for his own benefit. Paren-

thetically, we should say that the finding that the Hat Company became insolvent between 1907 and 1915, but that the court was unable to find at what time between these dates, cannot be used affirmatively to establish the insolvency before 1915, and all these stocks were bought prior to 1915.

That W. G. Green became by these transactions a constructive trustee, is well established by the authorities. In Pomeroy's Equity (Vol. 3, 4th Ed.) § 1044 *et seq.*, the subject of constructive trusts is elaborately discussed. In § 1044 Mr. Pomeroy says: "Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust. They arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. As trusts of this class are imposed by equity, contrary to the trustee's intention and will, upon property in his hands, they are often termed *trusts in invitum;* and this phrase furnishes a criterion generally accurate and sufficient for determining what trusts are truly constructive. An exhaustive analysis would show, I think, that all instances of constructive trusts properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source." In § 1045 Mr. Pomeroy says: "The specific instances in which equity impresses a constructive trust are numberless,—as numberless as the modes by which property may be obtained through bad faith and

unconscientious acts." Again, in § 1051, it is said: "A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. If one person having money or any kind of property belonging to another in his hands wrongfully uses it for the purchase of lands, taking the title in his own name; or if a trustee or other fiduciary person wrongfully converts the trust fund into different species of property, taking to himself the title; or if an agent or bailee wrongfully disposes of his principal's securities, and with the proceeds purchases other securities in his own name,—in these and all similar cases equity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrongdoer, but as long as it can be followed and identified in whosesoever hands it may come, except into those of a bona fide purchaser for value and without notice; and the court will enforce the constructive trust for the benefit of the beneficial owner or original *cestui que trust* who has thus been defrauded." And in the note to this section (p. 2400) it is further said: "In order that this species of trusts may arise, it is not indispensable that the conventional relation of trustee and *cestui que trust*, or even *any* fiduciary relation, should exist between the original wrongdoer and the beneficial owner, although such relation generally exists in these cases. Where securities have been stolen, and transferred and sold by the thief, a trust was held impressed upon them and on their proceeds, in the hands of the transferee, with notice." Citing *Newton* v. *Porter*, 69 N. Y. 133, 25 Amer. Rep. 152; *Bank of America* v. *Pollock*, 4 Edw. Ch. (N. Y.) 215. See also *Tecumseh National Bank* v. *Russell*, 50 Neb. 277, 69 N. W. 763; *Lightfoot* v. *Davis*, 198 N. Y. 261, 91 N. E. 582, 29. L R. A. (N. S.) 119. Also, in treating of trusts *ex maleficio*, Mr. Pomeroy, in § 1053, says: "In

general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, . . . or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same. . . . The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto*, are practically without limit. The principle is applied whenever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer."

It is perhaps not very important to attempt to determine exactly under which of Pomeroy's classes of constructive trusts the present case comes, because it is very apparent from the finding that the assistant treasurer was, without warrant or authority, using the funds of the company for his own benefit in the purchase of the stocks in question, and should be accountable to the company, in the absence of any action on the part of the company which showed a loan or gift, as a holder of the securities as trustee. The authorities are numerous, and a considerable number are collected in notes to the citations from Pomeroy. See also Story's Equity Jurisp. (Vol. 3, 14th Ed.) § 1663.

In the oral argument there was some discussion over the fact that, in the complaint and in the conclusion of the trial judge, the transaction was characterized as a resulting trust. The essential fact was that W. G. Green held these stocks in trust for the company. A resulting trust is based on intention presumed or implied from the circumstances of the transaction. The essentials have recently been stated in *Fox* v. *Shanley*, 94 Conn. 350, 109 Atl. 249. As seen above, a constructive

trust is not based on intention but arises *in invitum* for the purpose of working out justice in the most efficient manner. The ultimate result is not affected by the classification, and our disagreement with the trial judge on this point does not at all affect the correctness of his conclusion that the trust relationship existed. That a trust exists, whether resulting or constructive, is enough to support the judgment.

If, as we hold, these stocks in the hands of W. G. Green were impressed with a constructive trust in favor of the Hat Company, then the question arises as to the right of the defendant bank to hold them against the trustee in bankruptcy of the Hat Company, as pledgee to secure an indebtedness of W. G. Green.

As bearing upon this question, the further facts are that on and before May 26th, 1915, the defendant W. G. Green was, and for some considerable time had been, indebted to the defendant bank in the sum of $24,000 or more, evidenced by demand notes; that on or about May 26th, 1915, which was the day the Hat Company filed its voluntary petition in bankruptcy, an officer of the bank requested the defendant W. G. Green to furnish collateral, and Green thereupon delivered the stocks above mentioned to the bank as collateral for his notes. The stocks stood in the name of W. G. Green and bore no evidence that the Hat Company had any right or title to them. W. G. Green's brother, S. S. Green, as stated above, had, as treasurer of the Hat Company, full knowledge of the transaction by which W. G. Green obtained these stocks. This same S. S. Green was also president of the defendant bank at the time that W. G. Green pledged these stocks to the bank, but the finding does not state what officer of the bank made the request for collateral. It does not appear that the bank either gave anything or made any promise in return for the delivery of this collateral by W. G.

Green, or made any extension of time for payments, and the court finds explicitly that at the time of such delivery the defendant bank did not either actually pay or part with any valuable consideration or in any way alter its legal condition for the worse. This last finding necessarily excludes any agreement for an extension of time. Under such a state of facts the bank was not a bona fide purchaser for value and without notice, and gained no more interest in these stocks than W. G. Green himself had, which was nothing.

The defendant bank argues that it was a bona fide purchaser for value, because there was a pre-existing debt for which the stocks were assigned as collateral. As between pledgor and pledgee, the pledgor's pre-existing debt is consideration enough to support the pledge, so far as the pledgor has any beneficial interest in the stocks assigned or delivered as collateral. But under our law it is quite otherwise where the doctrine of consideration is invoked to defeat the equitable interest of a third party in the stock pledged. In *Hayden* v. *Charter Oak Driving Park*, 63 Conn. 140, 27 Atl. 232, this court, TORRANCE, J., said: "It is, perhaps, for the purposes of this case, sufficiently accurate to say that a bona fide purchaser is one who has bought property, without notice of the claims of third parties thereto, upon the faith that no such claims existed and who has therefore actually paid or parted with some valuable consideration or has in some way altered his legal condition for the worse."

In *Salisbury Savings Bank* v. *Cutting*, 50 Conn. 113, it was held that where a note was given for the total amount of prior occasional advances, and a mortgage then given to secure this note, the mortgagee was not a purchaser for value so as to shut out the equities of a prior mortgage given before the mortgagor acquired title and for money advanced at the time the mortgage

was given. In Jones on Mortgages (Vol. 1, 7th Ed.) § 460, it is said: "The mortgage or deed made to secure a pre-existing debt does not constitute the grantee a purchaser for value in good faith. The former, although given upon a valid consideration as between the parties, is not regarded as a purchaser for a valuable consideration which will entitle the mortgagee to protection against prior equities, although he had no notice of them when he took the mortgage. He must have parted with some value or some right upon the faith of the mortgage and at the time of it, to entitle him to protection as a purchaser. . . . But a mortgage to secure an antecedent debt is perfectly valid as between the parties, and as against all others who had at the time no equitable interest in the property. . . . The mortgagee for an antecedent debt acquires a lien upon the property to the extent only of the mortgagor's equitable interest at the time." In Thompson on Corporations, 2d Ed., Vol. 4, § 4234, it is said: "The pledgee of stock to secure an antecedent debt of the pledgor is not a bona fide purchaser for value, and therefore holds it subject to any lien which is valid against the pledgor, though he has neither actual nor constructive notice thereof." Citing *Schuster* v. *Jones*, 22 Ky. L. Rep. 568, 58 S. W. 595. The foregoing states the prevailing rule as well as the rule in this State, although there are some authorities inconsistent with it. See also Pomeroy's Equity (Vol. 2, 4th Ed.) § 749. The rule as above stated applies equally to a pledge of collateral securities. 14 Corpus Juris, p. 736, § 1120; Jones on Collateral Securities (3d Ed.) §§ 107*a*, 469.

The defendant bank further claims that because these certificates did not show that any one other than W. G. Green, pledgor, had any interest in them, they so far partook of the character of negotiable paper that, upon delivery or assignment to the bank as security for

a pre-existing debt, the bank was to be deemed a purchaser for value in the same way as if the collaterals had been negotiable instruments indorsed over before maturity; and cites *National City Bank of Chicago* v. *Wagner*, 132 C. C. A. 533, 216 Fed. Rep. 473. It is undoubted law that a "negotiable note transferred before due in the regular course of business to a creditor, in payment of, or as security for, a pre-existing debt, is taken in good faith and for a valuable consideration, and is collectible in the hands of the creditor, notwithstanding any equities . . . between the original parties thereto." *Roberts* v. *Hall*, 37 Conn. 205, 211, citing *Brush* v. *Scribner*, 11 Conn. 388, and *Bridgeport City Bank* v. *Welch*, 29 Conn. 475; these in turn are cited and followed in *Rockville National Bank* v. *Citizen's Gaslight Co.*, 72 Conn. 576, 581, 45 Atl. 361. See also Jones on Collateral Securities (3d Ed.) § 111. But it is equally well settled that a certificate of stock is not a negotiable instrument. Jones on Collateral Securities (3d Ed.) § 461; 3 R. C. L. pp. 850 and 851; 7 R. C. L. p. 213; 14 Corpus Juris, p. 664; 2 Cook on Corporations (7th Ed.) § 412. Furthermore, such a certificate does not conform to the definition of a negotiable instrument as contained in the Negotiable Instruments Act, General Statutes § 4359.

It is quite true that this court, in *Bridgeport Bank* v. *New York & New Haven R. Co.*, 30 Conn. 231, 275, said: "The certificate, accompanied by the assignment and power of attorney thus executed in blank, has perhaps a species of negotiability, although of a peculiar character, but one necessary to the public convenience, and to which it is no objection that the instrument has a seal." This was said only with reference to the effect of a blank power of attorney, executed under seal, as a method of transfer. This quality is sometimes described as "quasi-negotiability." 2 Cook on Corpora-

tions (7th Ed.) § 413. It appears, however, to be founded upon the doctrine of estoppel, and not upon the law merchant with reference to negotiable paper negotiated before maturity. Upon this point, Cook says, § 416: "Indeed, to such an extent has this law of estoppel been applied to protect a bona fide purchaser of stock, that, excepting in cases of certificates transferred in blank and lost or stolen without negligence on the part of the owner, a bona fide purchaser is protected now in almost every instance where he would be protected if he were purchasing a promissory note or other negotiable instrument." In other words, the so-called quasi-negotiability of certificates of stock does not in general arise from the negotiable character of the certificates, but because a somewhat similar result is reached through extrinsic facts upon which estoppel, with reference to the transfer of the certificate, may be based. Moreover, we have already seen that the bank was in no sense a bona fide purchaser, and therefore has suffered no loss by taking the certificates, and, having suffered no loss, lays no foundation for invoking the doctrine of estoppel.

We have examined the case of *National City Bank of Chicago* v. *Wagner*, 132 C. C. A. 553, 216 Fed. Rep. 473, upon which the defendant appears to rely upon this claim. That case assumes the similarity of stock certificates to negotiable commercial paper to be of such extent that it constitutes certificates negotiable paper, and then applies the rule as to negotiable paper, as generally held and as stated in the Negotiable Instruments Act, to stock certificates. We think that this assumption is, in the present state of the law, without convincing force. But the decision is really based upon Illinois doctrine conceded to be contrary to the weight of authority, and stated by the court to be this (p. 541): "The pledgee of an ordinary chattel, given to secure a

pre-existing debt, is protected as against a defrauded vendor thereof." The force of this claim of course is that a pre-existing debt makes the pledgee a purchaser for value. The learned court in this case also refers to the provisions of the Uniform Negotiable Instruments Act, the Uniform Sales Act, the Uniform Warehouse Receipts Act, the Uniform Bills of Lading Act, and the Uniform Stock Certificate Act. None of these Acts, except the latter, so far as we can discover, either in terms or by necessary implication, include certificates of stock within their provisions. As we have seen, the Negotiable Instruments Act in its definition clearly does not include certificates of stock. That the Sales Act should apply, it must be held that a certificate of stock is a negotiable document of title. The definition in the Act, General Statutes, § 4742, excludes the claim. A "'document of title to goods' includes any bill of lading, dock warrant, warehouse receipt or order for the delivery of goods or any other document used in the ordinary course of business in the sale or transfer of goods, as proof of the possession or control of the goods or authorizing or purporting to authorize the possessor of the document to transfer or receive, either by indorsement or by delivery, goods represented by such document." It is apparent from the definition that its scope under the Sales Act is limited to such documents as will authorize the holder to obtain specific goods from whoever has possession of them, such possessor ordinarily being a common carrier or a warehouseman. A certificate of stock, while it shows the fractional interest in the property of a corporation to which the owner of the certificate is entitled, in no way entitles the owner to the possession of any specific goods or to any property whatever except by way of dividends or a distributive share on the dissolution and winding up of the corporation. Whether the Uniform Transfer Act has

any relation to a case like this is quite immaterial, because our Act was not passed until 1917, and long after the transactions now under consideration. For these reasons we cannot subscribe to the doctrine that the defendant bank seeks to draw from the case last referred to.

The defendant bank also claims that the Hat Company has been guilty of laches with reference to this claim, that it is now too late for the company to assert title and therefore the trustee cannot. It does not appear so to us. The last of this collateral was not purchased until October, 1912, and the petition in bankruptcy was filed in May, 1915. Under the circumstances this is rather a short time on which to base laches, even if the other essential elements were not wanting. The collateral did not come into the possession of the bank until the very day of the assignment in bankruptcy. The record does not disclose any affirmative action or any representations of the Hat Company, or the knowledge of any one representing the Hat Company, at the time of, or in connection with, the pledge, other than W. G. Green himself. It does not appear that the bank ever knew that W. G. Green had these securities until the day they were pledged, unless such knowledge is imputable to the bank because S. S. Green, its president, knew the situation as financial manager of the Hat Company. Knowledge of the bank imputed in that way would be fatal to the claim of the bank, as the notice and knowledge of its president of the equitable interest of the Hat Company, so as to constitute the bank a taker with notice of the equities of the Hat Company. As already seen, the bank was in no way misled by any conduct of the Hat Company and parted with nothing by taking the collateral. In *Hartford* v. *Mechanics Savings Bank*, 79 Conn. 38, 41, 63 Atl. 658, it is said: "There is no merit in the defense

of laches. That exists only where there has been such a delay in the assertion of a claim as naturally to prejudice him against whom the claim is set up. *Waterman* v. *Sprague Mfg. Co.*, 55 Conn. 554, 574, 12 Atl. 240. Nothing appears in this case to indicate that the defendant has lost anything by the course taken by the plaintiff." See Pomeroy's Equity (Vol. 4, 4th Ed.) § 1442. Moreover, laches was not pleaded in the present case, *Robert* v. *Finberg*, 85 Conn. 557, 84 Atl. 366, though it was claimed on argument in the court below.

We do not see any merit in the further claim that if the Hat Company were solvent when these securities were purchased with its funds by W. G. Green, then the trustee in bankruptcy has no claim to them. As stated above, there is no certain finding of insolvency prior to 1915, at which time all the securities had been purchased. We cannot see that solvency or insolvency affects the continued existence of the constructive trust and the equitable property-right of the Hat Company; and no claim is made but that, if it existed at the time of the assignment in bankruptcy, it passed by operation of law to the trustee.

Nor do we think there is anything in the claim that because W. G. Green was an officer of the Hat Company, therefore the company should bear the loss caused by the fraud of its own officers. That would depend upon the circumstances of the case. Where, as here, its funds are converted into definite stocks and these stocks are found in the hands of one who is not a bona fide purchaser for value without notice, there is nothing to prevent the Hat Company from enforcing its claim as a constructive trustee at any time. It might also be that the bank, on account of the fact that S. S. Green was both president of the bank and financial manager of the Hat Company, not only parted with nothing for

the stock but received it with notice. As the finding is silent with reference to the actual participation of S. S. Green in the management of the affairs of the bank, and the proper decision of the case does not require it, we leave this question as to notice undecided.

What we have said refers specifically to the shares of stock. From the finding it appears that three bonds of the New York Realty Owners were purchased and pledged in the same way as the stock, and were included in the judgment of return. . There is no further finding with reference to these bonds, no special claim has been made distinguishing them from the stock, and no reference is made to them in the briefs, nor was there any claim as to these bonds, as we recollect it, upon the oral argument, and no claim referring specifically to the bonds appears to have been made in the court below. It was evidently assumed that these bonds, so far as the substance of the transaction was concerned, stood in no different position from the stock. In the absence of any such claim and of any details in the finding, we are not at liberty to assume any real distinction between the bonds and the stock, and must leave the judgment undisturbed as to them.

There was some claim made by the defendant bank that as holders of the legal title the bank would have priority of right. What we have said applies even if the stocks were regularly transferred by assignment and power of attorney executed in blank, but it is noticeable that nowhere is it found that such transfer was made. The finding is only that the securities were delivered. If there was delivery merely, with no transfer, the bank would be the equitable pledgee. Such a pledge may be made, but it is called an imperfect pledge, making suit in equity necessary for its enforcement and leaving the pledgee subject to the equities of third persons and *cestuis que trust.* 2 Cook on Cor-

porations (7th Ed.) § 465; 4 Thompson on Corporations (2d Ed.) § 4203; Colebrooke on Collateral Securities (2d Ed.) § 277. But we do not see that the plaintiff bases any claim on this distinction, and it may be that the term "delivery" was not used in the finding with the idea of drawing this distinction, especially as the judgment-file calls for a transfer and delivery of the stocks, not mere delivery; therefore this decision is not based on delivery alone without the ordinary assignment and power of attorney, whether executed to a person named or in blank.

There is no error.

In this opinion the other judges concurred.