[L. A. No. 18926. In Bank. Dec. 28, 1944.]

LUCILLE J. PORTER, Respondent, v. CLAIR J. GIBSON, Appellant.

Welburn Mayock for Appellant.

Harry G. Sadicoff for Respondent.

CURTIS, J.—This action was instituted for the recovery of the purchase price of certain shares of corporate stock, which it is alleged the defendant agreed to purchase from the plaintiff. Judgment was rendered in favor of the plaintiff and the defendant has appealed.

The agreement upon which the action is based was in writing signed by each of the parties thereto, and provided that the plaintiff "agrees to sell" to the defendant, and the defendant "agrees to buy" of the plaintiff, two hundred shares of stock of the Gibson Oil Company, a corporation, for the sum of ten thousand dollars ($10,000) at the rate of fifty dollars ($50) per share, and defendant agrees to pay for said stock at the rate of one hundred and fifty dollars ($150) per month, the first payment to be made at the date of the execution of the contract, July 24, 1939, and subsequent payments of one hundred and fifty dollars ($150) to be made monthly on the fifteenth day of each and every month until the sum of ten thousand dollars ($10,000) shall have been paid. The right was given to defendant to pay a greater amount each month than said sum of one hundred and fifty dollars ($150), and, if he elects, he may "take up the whole amount of the stock at any time upon the payment of the balance due at the said rate of fifty dollars ($50) per share. Buyer shall have the right to delivery to him of the stock paid for each month as it is paid for, but not in lots less than ten (10) shares. Buyer shall be under no further or additional obligation to purchase stock under this agreement should Gibson Oil Company be adjudicated a bankrupt or an assignment for the benefit of creditors be made by it or if Mr. Gibson, party of the second part, is removed from the management of the company through the action of its creditors or bankers."

Plaintiff retained the right to vote said stock until payment therefor shall have been made and the stock transferred to defendant on the corporate records. Various other provisions were contained in the agreement which concerned other matters of interest to the parties, but which are not material to any issue in this action, except paragraph 6 of said agreement, which is as follows: "In order that this agreement may operate to the protection of the parties, it is agreed that buyer and seller will create an escrow at the Bank of America, ———— ———— Branch, and that appropriate instructions and a copy of this agreement shall be entered therein by buyer and

seller, pursuant to which said two hundred (200) shares of stock shall be deposited therein by seller, and that said escrow instructions shall provide for the payment to and collection by said escrow holder, for the account of seller, of the purchase price of said shares in cash at the times and in the amounts as herein provided and for the delivery of said purchase price installments to seller as paid and for the delivery of said shares to buyer as paid for, but not in lots less than ten (10) share lots. The buyer is to pay all escrow charges and taxes on said transaction and seller is to receive the full amount of $50.00 per share without any deductions of any nature whatsoever. Time shall be the essence of this agreement and in particular of the payments herein provided to be made. It shall be a condition of said escrow and of this agreement that should buyer fail to make any payment for said shares at the times and in the amounts and manner herein provided, or in the event that buyer should fail to pay any escrow charges, taxes and other sums herein provided to be paid by buyer, then and in either of such events seller may withdraw from said escrow, without any notice to or demand upon buyer, all shares of said stock not paid for and withdrawn and seller may retain any of said shares as to which payment may have been made, as liquidated damages for any such breach of this agreement; and it shall be a further condition of this agreement and of said escrow that in the event of any such default in payment, said escrow holder shall redeliver to seller promptly and without question upon demand, notwithstanding any notice, demand or contention upon the part of the buyer, all of said shares not then withdrawn from said escrow, and that said escrow holder shall not be liable to buyer by reason of any such redelivery, and seller may otherwise dispose of said shares freed of the terms of this agreement.''

The escrow provided for in the agreement was opened on August 4, 1939. Defendant made the first payment called for by the agreement and continued to make these payments until March 16, 1940, when payments stopped. Up to the latter date defendant had paid $1,550 and had received thirty shares of stock, and there remained $50 in the possession of the escrow holder for one share of stock not delivered.

Beginning as early as August, 1940, the Gibson Oil Company was having financial difficulties with its creditors. A committee of the creditors was appointed; in September,

1940, a tentative agreement was entered into between the company and its creditors; and in November, 1940, a second agreement in writing was entered into between them. The later agreement is set out in full in the reporter's transcript, but we do not find the prior one in the record. The later agreement seems to be the one under which defendant and the creditors of the company operated its business. It gave to the creditors' committee certain rights over the operation of the business of the company as will be more particularly referred to later in this opinion. It provided, however, that the defendant C. J. Gibson, should be retained "to manage the affairs of the Company, subject to the terms of this and the former agreement and subject to the control of the committee as in this and said former agreement set forth." His salary was fixed at the sum of $250 per month, or "ten (10%) per cent of the Company's net production, whichever is less." There is evidence in the record showing that the net production of the company was $2,500 or thereabouts, each month.

On May 27, 1942—the defendant having failed to make any further payments under his agreement with plaintiff other than those mentioned above—the plaintiff, pursuant to the terms of the agreement, withdrew from escrow the shares of stock theretofore deposited with the escrow holder, and thereupon delivered the same to defendant properly endorsed with a demand for the payment of the sum of $3,700, the accrued installments then due and unpaid. On May 29, 1942, she filed the present action seeking to recover said amount. At the trial of the action on January 14, 1943, plaintiff filed a supplemental complaint covering payments falling due under the agreement between the date of filing of the action and the date of trial. The amount then alleged to be due and unpaid was the sum of $4,750. Judgment was rendered in favor of plaintiff and against defendant for this amount, together with interest. The defendant has appealed from the judgment.

By his answer defendant admitted the execution of the contract, and that he had paid only the sum of $1,550 on the purchase price of the stock. As a special defense he alleged that he was removed from the management of the Gibson Oil Company in September, 1940, and since that date the company had been under the direction, management and control of a

creditors' committee, appointed under an agreement between the company and its creditors.

In answer to paragraph III of plaintiff's complaint, in which the plaintiff alleged that she had delivered to the defendant the two hundred shares of stock and had demanded payment of the sum of $3,700, the defendant admitted the delivery to him on March 19, 1940, of thirty shares of said stock, which were fully paid for by him, and also the one hundred seventy additional shares of stock, but that he returned the one hundred seventy shares of stock to plaintiff or her attorney, who now holds possession thereof. Defendant further alleged that in June, 1942, the one hundred seventy shares of stock were sold for failure to pay a delinquent assessment and the penalty thereon, and that by reason of said sale neither plaintiff nor defendant since the sale was the owner of said one hundred seventy shares of stock. The findings of the trial court were that each and all of the allegations of plaintiff's complaint and supplemental complaint were true, and that each and all of the allegations and denials of defendant's answer were untrue, "excepting that it is true that the defendant paid to plaintiff the sum of Fifteen Hundred and Fifty Dollars ($1550.00)."

As stated above, this action was instituted to recover the purchase price of certain personal property (shares of corporate stock) which the plaintiff had agreed to sell and the defendant had agreed to buy at the stipulated price of $10,-000. It is the position of defendant that the right to prosecute this action for the recovery of the purchase price of said stock is governed by the provisions of the Uniform Sales Act (Stats. 1931, chap. 1070, p. 2234). Sections 1721 to 1800 of the Civil Code, inclusive, were then made to contain the provisions of the Uniform Sales Act. The subject of the act is "Sale of Goods." By said act, section 1796 of the Civil Code, " 'Goods' include all chattels personal other than things in action and money. The term includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale." It will be noted that this definition of "goods" does not specifically mention shares of corporate stock. It is obvious that shares of corporate stock are not money, neither are they emblements, or growing crops, or things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale.

As chattels personal they are included within the statute unless they are "things in action." Whether shares of corporate stock are "goods" within the meaning of the Uniform Sales Act has never been before the appellate courts of this state, except in the case of *Eckart* v. *Brown,* 34 Cal.App.2d 182 [93 P.2d 212]. In that case at page 188, the court stated: "It has uniformly been held that the Uniform Sales Act does not include within its provisions a contract for the repurchase of shares of stock. (*Smith* v. *Lingelbach,* 177 Wis. 170 [187 N.W. 1007, 1008]; *Goodhue* v. *State Street Trust Co.,* 267 Mass. 28 [165 N.E. 701, 704]; *Millard* v. *Green,* 94 Conn. 597 [110 A. 177, 181, 9 A.L.R. 1610]; 1 Uniform Laws Annotated (1931) 15.)"

It might be well to review the decisions of other jurisdictions insofar as they have given consideration to the question now before us. The purpose of the Uniform Sales Act, as well as other legislation of like character, is to establish, insofar as it is reasonable, uniformity in the laws of the several jurisdictions in respect to the matters which are the subject of such legislation. In carrying out this plan there have been enacted the Uniform Negotiable Instrument Act, the Uniform Sales Act, the Uniform Warehouse Receipts Act, the Uniform Bills of Lading Act, the Uniform Stock Certificate Act, and the Uniform Partnership Act, and acts on miscellaneous subjects not necessary to mention here. To make this plan practicable and to carry out its intent and purpose, courts should strive to make their decisions construing the various provisions of these Uniform Acts as nearly uniform as possible, consistent with their understanding of the principles of law applicable to the particular subject before them.

The decisions of courts of last resort of other states that have adopted Uniform Sales Acts are practically unanimous in holding that certificates of stock are choses in action, and are not included in the term "goods" as defined in the Uniform Sales Acts. (*Millard* v. *Green,* 94 Conn. 597, 609 [110 A. 177, 9 A.L.R. 1610]; *Goodhue* v. *State Street Trust Co.,* 267 Mass. 28, 34 [165 N.E. 701]; *People's Bank* v. *Kurtz,* 99 Pa. 344, 349 [44 Am.Rep. 112]; *Guppy* v. *Moltrup,* 281 Pa. 343, 348 [126 A. 766]; *Smith* v. *Lingelbach,* 177 Wis. 170, 172 [187 N.W. 1007]; *Henderson* v. *Plymouth Oil Co.,* 13 F.2d 932, 937.) The only case to which our attention is called which appears to hold to the contrary is *Postal* v. *Hagist,* 251 Ill.App.

454. That case involved the rights of the parties to the proceeds from the sale of shares of corporate stock, which had been sold to a trustee. In discussing the problem then before it, the court stated at page 466: "The provisions of the Uniform Sales Act, Cahill's St. ch. 121a, § 4 *et seq.,* are applicable to the sales of corporate stock. See *Illinois-Indiana Fair Ass'n* v. *Phillips,* 328 Ill. 368 [159 N.E. 815, 59 A.L.R. 591]." An examination of the case of *Illinois-Indiana Fair Ass'n* v. *Phillips* shows that the only question involved there was the statute of frauds, and that the provisions of section 4 of the Uniform Sales Act of that state expressly provided that certain contracts must be in writing, including a contract to sell or a sale of any goods or *choses in action* of the value of $500. We find nothing in that decision which holds, or even intimates, that certificates of stock are not choses in action, or that they are included in the term "goods."

It is also claimed that there is dictum in the case of *Davis Laundry & Cleaning Co.* v. *Whitmore,* 92 Ohio St. 44 [110 N.E. 518, Ann.Cas. 1917C 988] to the effect that shares of stock are not choses in action. (This dictum, says Mr. Williston, is not to be followed as it is incorrect, and the right conclusion was reached in *Millard* v. *Green,* 94 Conn. 597, *supra.*) (Williston on Sales (2d ed.), § 619.)

A later decision on this question is *Agar* v. *Orda* (1934), 264 N.Y. 248 [190 N.E. 479, 99 A.L.R. 269]. In that case the court refrained from expressly deciding the question as to whether certificates of stock were or were not "goods," but assumed that if (page 251) "the Legislature did not intend to include certificates of stock in its definition of 'goods' . . . yet the fact remains that certificates of stock, like other 'goods,' are freely bought and sold in the market place and pass from hand to hand, and [an] analogy so complete may dictate that the rules governing sales be applied alike to 'goods' and other personal property freely bought and sold and passing from hand to hand." The court proceeded to hold that as the Legislature by the Uniform Sales Act had changed the rule governing the sale of "goods," except choses in action, and had made no change in the rule governing the sale of certificates of stock, it had left to the courts to formulate a rule applicable to cases not covered by the statute—or to be specific, applicable to certificates of stock. Having determined that the power to formulate such a rule had been left to the

courts, the New York Court of Appeals, in the interest of uniformity, held that the rule which the Legislature had made applicable to ''goods'' other than choses in action should apply to the sale of certificates of stock, although the latter were choses in action.

Assuming that the New York Court of Appeals had the power and authority to prescribe a rule for the sale of certificates of stock and make it conform to the rule established by the Legislature for the sale of other classes of personal property, and that this court has the same power, we are not persuaded that we should exercise that power and promulgate a rule applicable to shares of stock which the Legislature in this state neglected to establish in the enactment of the Uniform Sales Act. It must be admitted that the Legislature's failure to include shares of stock within the provisions of that act was intentional, as the act expressly excludes choses in action (shares of stock). If we were to establish a rule governing the sale of shares of stock, it seems that it would be much more consistent for us to act in harmony with the Legislature which left contracts for the sale of shares of stock unaffected by the terms of the Uniform Sales Act. We prefer however, not to exercise the power, if we have it, to formulate any rule upon the subject in view of the action of the Legislature. The law governing contracts for the sale of shares of stock therefore remains unchanged in this state by the enactment of the Uniform Sales Act.

Since certificates of stock as choses in action are expressly excluded from the terms of the Uniform Sales Act, sales or agreements of sale of corporate stock are not in any manner controlled by any of the provisions of that act. The rights of the parties therefore in this action must be determined by the law applicable to sales of shares of stock independent of any provision of the Uniform Sales Act.

By their contract defendant Gibson agreed to buy and plaintiff agreed to sell to him the shares of stock covered by the agreement. Prior to the commencement of this action defendant defaulted in the payments under the contract, and plaintiff delivered to him the two hundred shares of stock properly endorsed and demanded payment of the amount due her under said contract. At the time of trial there was the sum of $4,750 due and unpaid under the contract, and judgment was rendered in favor of plaintiff for said amount.

One of the rights of a vendor of personal property under a contract for the sale of such property, upon the refusal of the vendee to take the property and pay the agreed price, is "Standing on the sale the vendor may retain the property for the vendee and sue for the purchase price." (*Cuthill* v. *Peabody*, 19 Cal.App. 304, 308 [125 P. 926].) This is just what the plaintiff has done in this case. On default of defendant to make the payments called for under the contract of sale, she withdrew the shares of stock from escrow and sent them to defendant. The latter after retaining the stock for a period of time, returned one hundred seventy shares to plaintiff, who then notified defendant that she held the shares of stock for him and that he could have them at any time "as they are your property." Plaintiff has clearly brought herself within the rule established in *Cuthill* v. *Peabody*, *supra*.

Appellant contends that under the agreement it would be impossible to maintain an action for the purchase price because payment must be made into escrow before delivery of the stock was due or title to it passed; and that if payment under the agreement must precede the passing of title, then under the agreement, when title had passed, payment had already been made and could not be sued for a second time. In other words, the contention amounts to this—title does not pass until the defendant pays into escrow installments on account of the purchase price amounting to $500; then stock in that amount is delivered to him; and at that time, and not before, the property passes to defendant. It may be conceded that as long as the shares of stock remained in escrow the title to all of said stock stood in the seller, and the buyer acquired title only to such portion of said shares as was paid for by him; but when he defaulted in the payment of the stock, the contract provided for the delivery by the escrow holder to the seller of "all of said shares not then withdrawn from said escrow . . . and the seller may otherwise dispose of said shares freed of the terms of this agreement." It will be noted that upon the buyer's default, the seller was entitled to receive from the escrow holder all stock unpaid for and was freed of the terms of the agreement, but nothing is said about the buyer being freed of the terms of the agreement. Upon the buyer's default in the payment of the stock the seller would not be further bound by the agreement of sale, but this default of the buyer did not free him from the terms of the contract. He

was still bound to purchase the stock, and when the stock was delivered to him by the seller and demand made for its payment, the title passed to him and the seller could sue for the purchase price. (*Cuthill* v. *Peabody, supra.*)

The further provisions contained in paragraph 6 of the agreement do not show any different intention nor compel a conclusion that the property in the shares of stock would not pass to the buyer upon his default and the delivery to him of the stock and demand made for payment. These provisions simply give to plaintiff certain additional rights in case defendant fails to comply with the terms of the agreement, but they do not in any manner purport to take from her the right to sue for the purchase price of the stock. Plaintiff, in withdrawing the shares of stock from escrow, acted strictly in pursuance of the terms of the agreement. Defendant's claim that by so doing plaintiff "cancelled" the contract is without merit. ■ The provision of said paragraph purporting to give to plaintiff liquidated damages in case of defendant's failure to comply with the terms of the agreement was void (Civ. Code, § 1670), as it would be neither impracticable nor extremely difficult to fix plaintiff's actual damage for defendant's breach of his contract (Civ. Code, § 1671), and plaintiff made no attempt to enforce this provision of the contract. Neither did plaintiff attempt to dispose of said shares of stock after their withdrawal by her from escrow otherwise than to tender them to defendant and demand payment of the amounts which defendant had agreed to pay for said stock. We fail to see how any of the terms of paragraph 6 of the agreement indicate or would support a determination that the shares of stock did not pass to defendant upon their delivery to him by plaintiff and demand made for their payment after defendant had defaulted in their payment. That being the case, an action for the purchase price is a proper proceeding against defendant for his failure to comply with his agreement.

■ One of the conditions of the agreement involved in this action is that "buyer shall be under no further or additional obligation to purchase stock under this agreement . . . if Mr. Gibson, party of the second part, is removed from the management of the company through the action of creditors or bankers." In defendant's answer, as noted above, he alleged that in September, 1940, he was removed from the management of the company through the action of its creditors

and bankers, and since that date the company has been under the direction, management and control of a creditors' committee appointed pursuant to an agreement between the company and its creditors.

The evidence shows that an agreement bearing date of November 20, 1940, was entered into between the Gibson Oil Company and a committee of the creditors, whereby the committee of creditors was given certain supervision over the affairs of the company: no expenditures should be made by the company exceeding in amount the sum of $25; all checks issued by the company were to be countersigned by a member of the committee; the members of the committee were to have access at all times to the company's books; no contract was to be entered into by the company without the consent of the committee; and the company agreed to comply with the recommendations of the committee as to the operation of the company. There were many other provisions in the agreement but they were concerned principally with the manner in which the committee would function, and other matters not affecting the operation of the company.

This agreement was executed in the name of the company by Mr. Gibson as president and his secretary as secretary of the company. By paragraph 3 of the agreement, Mr. Gibson was ''retained to manage the affairs of the Company, subject to the terms of'' the agreement and subject to the control of the committee at a salary of approximately $250 per month. Mr. Gibson personally agreed in writing to all the provisions of this paragraph of the agreement. He continued as manager of the company under the terms of the agreement up to the time of the trial of this action, and there is nothing before us to show that his relations with the company have undergone any change since the trial. The trial court found against defendant on his claim that he was removed from the management of the company, and there is an abundance of evidence to support such finding. In fact there is practically no evidence supporting defendant's claim. It may be true that his powers and duties after the execution of the creditors' agreement were not as broad and extensive as they were before that time. Before the creditors stepped into the affairs of the company, Mr. Gibson was president, manager, and owner of all of its stock. He was the *alter ego* of the company and could manage the affairs of the company

without let or hindrance of any person whatever. But while he was shorn of much of his former powers by the creditors of the company, he still continued to manage its affairs, though under the supervision and direction of the committee. He was never removed from its management.

■ Defendant further contends that finding III is not supported by the evidence. To understand properly the basis of this contention, it will be necessary to refer to the pleadings respecting the matter in issue upon which said finding was based. In paragraph III of plaintiff's complaint, she alleged that she had delivered to defendant the two hundred shares of stock of the Gibson Oil Company and demanded of defendant the payment of the sum of $3,700. Defendant in his answer expressly *admitted* the receipt of thirty shares of said stock, and impliedly admitted the receipt of all of said stock. He further admitted ''that prior to the filing of this action plaintiff caused one hundred seventy (170) shares of stock to be delivered to him but that he returned said shares of stock to plaintiff . . . and that plaintiff . . . is now in possession of said stock.'' This is the only answer defendant made to the allegation in paragraph III of plaintiff's complaint, that is, that plaintiff delivered to defendant said two hundred shares of stock. It is an admission that said two hundred shares of stock were delivered to defendant, and *an admission,* not an *allegation,* that defendant caused one hundred seventy shares of stock to be returned to plaintiff. Treating it, however, as an allegation, the finding of the court that it was not true is contrary to the evidence, which shows without conflict that defendant did return said shares of stock to plaintiff and that plaintiff's attorney acknowledged their receipt, in which he stated that ''The certificates are held by me for your account and you can have them at any time you desire, as they are your property.'' Defendant now contends that the judgment against him should be reversed upon the ground that the finding under attack was not supported by the evidence. Considering the pleading upon this issue, and the uncontradicted evidence respecting the delivery of said stock by plaintiff to defendant, we would not be justified in reversing the case on account of the error complained of. If it were necessary we might make a finding to conform to the evidence which would support the judgment, but we do not consider the matter of sufficient importance to take such action.

 Another claim by defendant in support of his appeal is that the one hundred seventy shares of stock of the Gibson Oil Company was, after the commencement of this action and on June 25, 1942, sold to a third party to satisfy an unpaid assessment levied by the company upon its capital stock. Plaintiff attacks this sale and claims that it was fictitious; that the levy of the assessment was instigated by defendant and the stock was sold in payment of the same for the purpose of forestalling plaintiff's right to recover under said agreement of sale. This matter was not made an issue by the pleadings and consequently was not made the subject of any finding. While the record discloses persuasive evidence in support of plaintiff's contention that the whole assessment proceeding, including the sale of the stock thereunder, was not bona fide, but was for the ulterior purpose of depriving plaintiff of her rights under the contract with defendant, it is not necessary for us to pass upon that question in view of the fact that said sale under the assessment took place after the default of defendant and after plaintiff had delivered the stock to him and demanded payment of the same. As the title to the stock then passed to defendant, it belonged to him at the time of the sale and any loss sustained by the sale of the stock under said assessment proceedings would fall upon the defendant, the then owner of the stock.

In view of our conclusion upon the matters discussed above, the judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellant's petition for a rehearing was denied January 25, 1945.