[L. A. No. 22369. In Bank. Dec. 19, 1952.]

GEORGE T. FRANCK et al., Respondents, v. THE J. J. SUGARMAN-RUDOLPH COMPANY (a Partnership) et al., Defendants; J. J. SUGARMAN et al., Appellants.

Knight, Gitelson, Ashton & Habenbaugh, Alfred Gitelson and Leon Savitch for Appellants.

John W. Preston and John W. Preston, Jr., for Respondents.

CARTER, J.—Plaintiffs commenced an action for money had and received in the sum of over $65,000. Defendants, a partnership hereafter referred to as defendant, and the partners, answered raising general issues and also counterclaimed and asserted affirmative defenses for over $98,000, and raised the defense of the statute of limitations (Code Civ. Proc., §§ 339[1], 337[1], 338[4], 343).

The judgment from which defendant appeals awarded plaintiffs $64,054.61, with interest, and that defendant take nothing by the counterclaim. The court excluded evidence on the affirmative defenses and counterclaim on the ground that defendant had waived them.

According to the findings, on August 7, 1943, plaintiffs entered into a written agreement with defendant, agreeing to sell all of the issued shares (3,267) of Hercules Foundries, Inc., a corporation, (hereafter called Hercules) for $110,000. The contract provided that plaintiffs "represent and guarantee" that the financial condition and property of Hercules was (as of July 31, 1943) as set forth in the contract, and in reliance on that "guarantee" defendant promised to buy the stock and to pay for it as follows: $10,000 on execution of the contract, $90,000 on delivery of the stock and the balance of $10,000 when they received (paragraph 2[c]) "a

certificate signed jointly by'' plaintiffs' auditor and defendant's auditor ''verifying the truth of the representations'' and guarantees above mentioned.

Plaintiffs delivered to defendant the stock and all the assets and records of Hercules on August 16, 1943. On August 18, 1943, the United States Collector of Internal Revenue filed a lien for taxes against Hercules for $103,112.67. To meet that situation and pay the taxes under protest the parties entered into a new contract on August 21, 1943, modifying the first one to the effect that from the money payable by defendant to plaintiffs for the stock there would be paid under protest sufficient to discharge the tax lien; and that defendant would cause Hercules to prosecute a claim for refund of the $103,112.67 for the use of plaintiffs. Mention was again made of the guarantee and audit and it was provided that if the tax refund is received, defendant will cause Hercules to assign to plaintiffs all right to the refund subject to such existing offsets, if any, arising out of the ''guarantee.'' Pursuant to the agreements, escrows were provided and other supplemental agreements were made which are discussed later herein.

In accordance with the last contract the tax lien was paid and a refund claim made, resulting in refunds in August and December, 1948, amounting to $82,546.45.

In compliance with paragraph 2(c) of the first contract (above mentioned) shortly after the delivery of the stock, etc., defendant had its auditors make an audit of Hercules' books. The auditors submitted to defendant a preliminary report in the latter part of September, 1943, and a final report in September, 1944, and at all times thereafter defendant had actual knowledge of all matters pertaining to the property, assets and financial condition of Hercules as of July 31, August 7 and August 21, 1943. The audit showed according to defendant's counterclaim and affirmative defenses, that the value of Hercules' assets was $98,448.74, less than represented by the guarantee and balance sheet in the first agreement. Plaintiffs had no such knowledge and did not know that defendant claimed or asserted the assets were less than represented in the first agreement or that a violation of that contract had occurred until they were notified by and received from defendant a copy of the audit on July 31, 1947. Defendant accepted the stocks, assets and records of Hercules and at all times has retained exclusive possession thereof. Finding that an unreasonable time elapsed between the audit and

notification to plaintiffs, the court concluded defendant had waived the purported breach of promise as to the assets of Hercules upon which its affirmative defenses and counterclaim are based and the claim of breach was barred by laches and section 1769 of the Civil Code.

Finally, the court concluded that defendant held for and was indebted to plaintiffs in the sum of $64,054.61, which was the amount of the tax refund recovered less expense of recovery.

In addition to defendant's having obtained and retained at all times after August 16, 1943, and after they knew the claimed breach of the "guarantee," all the stock and assets of Hercules, it appears from the record that after the contracts were made, correspondence passed between Mr. Gazlay, a representative who was handling the matter for plaintiffs, and Mr. Katz, the representative of defendant. On September 13, 1943, Gazlay wrote to Katz stating that defendant's auditors had said the audit was practically completed; that it should be completed as soon as possible and that plaintiffs should receive a statement from defendant as to whether it claimed the assets and financial condition of Hercules was not as represented in the contract; that the time to settle the matter was "now when the facts are fresh and records available." Katz replied on September 14, 1943, agreeing with the thoughts expressed by Gazlay and stating that he had asked the auditors for a report and would advise Gazlay as soon as he had it. On September 30, 1943, Gazlay wrote to Katz calling his attention to the previous correspondence and again requesting the report. On October 4, 1943, Katz sent to Gazlay a copy of a letter from defendant's auditors which was in response to a letter from Katz to the auditors. The auditors stated they expected to have a final report ready on October 11, 1943, a draft of which had been made. On October 11, 1943, Gazlay wrote to Katz. He referred to the copy of the auditors' letter and stated that under the contract the report should be finished in a reasonable time and such time had elapsed and the matter should be settled now while the facts were fresh in the parties' minds. Receiving no reply from Katz, Gazlay wrote to Katz on November 2, 1943, demanding the report and stating that the failure to furnish it was a breach of the contracts. Again receiving no reply Gazlay wrote on January 6, 1944. He referred to the former correspondence and of Katz' refusal to speak to him on the telephone and

stated: "... it would appear that I am entitled to at least professional courtesy. If your clients do not desire to give the statement, you could at least have written an evasive letter, at which I am advised you excell. I resent the treatment received from you. I again request a copy of the statement hereinbefore referred to." In a letter from Katz to the auditors on September 14, 1943, Katz stated he agreed with Gazlay that then was the time to determine whether the balance sheet in the contracts was correct. Gazlay died in 1944 and several of plaintiffs' predecessors in interest died. As before seen from the findings, defendant had a preliminary report in the latter part of September, 1943, and the final in September, 1944, but did not give a copy to plaintiffs or advise that they made any claim of a breach of the "guarantee" until July 31, 1947.

As seen from the findings it was the theory of the trial court that defendant lost its claim for damages for the alleged breach of the guarantee because of the unreasonable length of time elapsing after their discovery of the claimed deficiency of Hercules' assets (at least three years) and by reason of the conduct of defendants during that time. As we construe the findings they may be based on either laches, waiver, or a failure to comply with section 1769 of the Civil Code.*

Defendant's main contention is that it did not lose its rights under any of those theories; that section 1769 cannot apply because it is a part of the Uniform Sales Act as adopted in this state and does not include sales of stocks in a corporation; that, as the action is legal in nature the equitable doctrine of laches cannot apply; that there was no assent to the alleged breach of the guarantee; and that there could be no bar by laches, waiver or otherwise because the contracts contemplated and the law is that any claimed deficiency in the assets would be offset against the purchase price; that in effect the purchase price was not to be paid until the correctness of the "guarantee" and the amount of recovery for refund of taxes had been ascertained.

---

*Civil Code, § 1769: "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

■ Section 1796 of our Civil Code reads the same as, and is a part of, the Uniform Sales Act, adopted in this state. The act, with the exception of the statute of frauds provision (Civ. Code, § 1724), refers to the sales of goods and that term is defined to "include all chattels personal other than things in action and money. The term includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale." (Civ. Code, § 1796.) And, by reason thereof, it has been held inapplicable to the sale of corporate shares. (*Porter* v. *Gibson*, 25 Cal.2d 506 [154 P.2d 703]; *Eckart* v. *Brown*, 34 Cal. App.2d 182 [93 P.2d 212]; Williston on Sales (rev.ed.), § 619[a].) It was also stated in the Porter case that the court would not apply the sales act to sales of stock by analogy and for sake of uniformity as was done in *Agar* v. *Orda*, 264 N.Y. 248 [190 N.E. 479]. It may be noted that this state has also adopted the Uniform Stock Transfer Act (Corp. Code, §§ 2450 et seq.) but no provision thereof has been indicated as supplying a solution to the instant case. That being the case it is of no assistance in determining what rule should be applied here. The court went on in the Porter case, however, and applied the law of sales of personal property (other than as stated in the sales act), particularly as enunciated in *Cuthill* v. *Peabody*, 19 Cal.App. 304 [125 P. 926], which, in dealing with sales of stock, relied upon the provisions of the Civil Code and rules of law in cases dealing with the sales of personal property as they existed before the Uniform Sales Act was adopted.

■ The first sentence of section 1769 of the Civil Code, *supra*, states that in the absence of agreement the acceptance of the goods does not discharge the seller for breach of promise or warranty, but the second sentence requires notice by the buyer of a claimed breach in a reasonable time to preserve his rights. The purpose of the two sentences was to "ameliorate the harshness of the common law rule in some states that the mere acceptance by or passage of title to the buyer of the goods constituted a waiver of any and all remedies for breach of warranty, and at the same time to give the seller some protection against stale claims by requiring notice. (See discussion, Williston on Contracts [rev.ed.], § 714.)" (*Whitfield* v. *Jessup*, 31 Cal.2d 826, 828 [193 P.2d 1].) ■ Apparently the rule was, before the uniform act, as to the sale of personal

property generally that an acceptance of the goods by the buyer, knowing of the breach of warranty, constituted a waiver by him of a claim for damages for the breach, at least unless he gave notice of his complaint within a reasonable time. (See *Streff* v. *Gold Medal Creamery Co.,* 96 Cal.App. 18 [273 P. 831] ; *Gladium Co., Inc.* v. *Thatcher,* 95 Cal.App. 85 [272 P. 340] ; *Stockton Lbr. Co.* v. *Mulcahy,* 86 Cal.App. 505 [260 P. 897] ; *American Steel Pipe etc. Co.* v. *Hubbard,* 42 Cal.App. 520 [183 P. 830] ; *Burrell* v. *Southern Calif. C. Co.,* 35 Cal.App. 162 [169 P. 405] ; *Doak Gas Engine Co.* v. *Fraser,* 168 Cal. 624 [143 P. 1024] ; *Byron Jackson Machine Works* v. *Duff,* 158 Cal. 47 [109 P. 616] ; *Pigott* v. *Clark,* 133 Cal. App. 53 [23 P.2d 800] ; 22 Cal.Jur. 983-988.) The same rule is stated in the Restatement. (Rest., Contracts, § 412.) And it has been held either tacitly or directly that the general rules on sales of goods applied to sales of corporate stock. (See *Cuthill* v. *Peabody, supra,* 19 Cal.App. 304; *Kirkland* v. *Levin,* 63 Cal.App. 589 [219 P. 455] ; *Porter* v. *Gibson, supra,* 25 Cal.2d 506.)

There appears to be no valid reason why the rule applicable to the question here involved and stated in the sales act and probably the law before the sales act, should not apply to sales of stock in a corporation, especially when it is remembered that the sale included all of the stock, and in effect, all of the records and assets, tangible and intangible, of the corporation. Although defendant did not know of the financial condition of Hercules when the stock was transferred, it found out later and for over three years made no claim of the breach of the guarantee, and in the meantime some of the parties concerned with the transaction died. From the correspondence between Gazley and Katz, the latter, as above seen, agreed that defendant's auditors should make their report within a reasonable time and it should be ascertained whether there was any claim of a breach of the guarantee by plaintiffs while the facts were fresh in the minds of the parties. The reason, to protect the seller from stale claims (*Whitfield* v. *Jessup, supra,* 31 Cal.2d 826) is present. Hence, we conclude that the trial court was correct in its conclusion, although it did specifically mention section 1769 of the Civil Code as one of the grounds for its ruling, and that section may not be technically controlling. It is true that there are indications in the record that the court was basing its conclusion on section 1769, but as we have seen, the findings are broad enough to include waiver, and it makes no difference

whether that was based upon the law of sales of personal property apart from the sales act or the sales act itself, as the rule is substantially the same.

Defendant argues, however, that even assuming section 1769 to be applicable, there are other supplemental agreements as well as the agreements of August 7 and 21, 1943, which show that any deficiency in the assets as compared with the "guarantee" was to be ascertained when the tax refund was obtained (it was received in 1948, one year after defendant gave notice to plaintiffs of the claimed breach of "guarantee") and then any offsets by reason of the deficiency were to be made against the refund. Escrow instructions were entered into pursuant to the August 7th contract whereby $90,000 was to be deposited with a bank by defendant and paid out by the bank when it received a certificate signed by the auditors of the parties as prescribed by paragraph 2(c) of the August 7th contract, and if the certificate shows a deficiency in the assets the latter should be deducted and the balance paid to plaintiffs. On August 19, 1943, after the tax lien was filed the parties in an agreement referred to the tax lien and the $90,000 which was deposited with the bank and provided that that sum plus $15,000 (including the $10,000 down payment) be deposited with the federal court wherein the tax refund action was pending and the balance (after a certain deduction) shall be applied to pay defendant the amount of any deficiency under the guarantee as determined by the auditors of the parties. Then followed the contract of August 21, 1943, heretofore mentioned, in which it was provided that the balance of the purchase price (after mentioning the method for payment of a small portion of it) shall be payable out of the tax refund when received, subject as above mentioned to the offsets, if any, by reason of any deficiency in the assets which shall be deducted from the refund.

Implicit in the court's finding that an unreasonable time had elapsed after defendant discovered the asserted deficiency, is the conclusion that the audit and claim of deficiency must be made in a reasonable time after the contracts were made, and the correspondence heretofore discussed shows that Katz, defendant's representative, so construed the agreements. It also shows that the parties considered that the audit should (at least initially) be made by defendant's auditors, which, of course, is reasonable because the audit was primarily for defendant's benefit, inasmuch as it was the party who would be

benefited if there was a deficiency in the assets. Defendant had the possession and control of the records and assets of Hercules. Plaintiffs had no real opportunity to have their auditors make an audit as Katz kept stalling on the report of defendant's auditors, never even mentioning an audit by plaintiffs' auditors. While the agreements speak of payment in terms of offsets, the trial court was justified in finding impliedly at least (it found waiver and that an unreasonable time had elapsed) that defendant should give a reasonable time notice of any claimed deficiency disclosed by the audit after it discovered the same. ▇ Merely because the amount of payment for the stock was to be reduced by offsets arising out of a deficiency, does not necessarily mean that a notice of the asserted deficiency should not be given in a reasonable time after discovery, that is, that the rule of law above held applicable to this case does not apply.

In this same connection defendant cites *Jones* v. *Mortimer*, 28 Cal.2d 627 [170 P.2d 893], where we held that under certain circumstances cross-demands between parties under section 440 of the Code of Civil Procedure will be deemed compensated and thus paid to the extent they equal each other and hence the statute of limitation does not run on the paid portion. That has no application in the instant case where the rule of law declared is applied, because here the right to have damages or offset for the alleged breach of the "guarantee" is waived for failure to give notice of the claim of breach within a reasonable time. Hence it necessarily follows that the right to have the cross-demands compensate each other is lost.

By reason of the result reached herein it is unnecessary to consider the contentions with reference to laches.

▇ Defendant contends that the court erred in failing to make a finding on its plea of the statute of limitation. However, it is a mere matter of law and mathematical computation, for whether we assume the two-year period applies, as for money had and received (Code Civ. Proc., § 339[1]), or the four-year period, as for an action for breach of contract (Code Civ. Proc., § 337[1]), it is admitted that on August 24 and December 21, 1948, the federal government refunded the taxes. The action was commenced on June 8, 1949, less than one year thereafter and the balance of the purchase price was not to be paid to plaintiffs until the refund was obtained and hence the action did not accrue at least until then.

Finally, it is asserted by defendants that a recovery could not be had for money had and received because the tax refund was received by Hercules, which was removed as a party to the action, rather than defendant. Without going into the question of whether the action was for money had and received or on the contracts, it is clear that the tax refund received by Hercules was for the use and benefit of plaintiffs under the agreements which provided that if the refund was received by Hercules, defendant would cause Hercules to assign it to plaintiffs since all the stock and assets of Hercules had been delivered to defendant at that time pursuant to the agreements.

The judgment is affirmed.

Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Edmonds, J., concurred in the judgment.