In re BLACK & GEDDES, INC., Debtor.

DAMPSKIBSSELSKABET AF 1912 AK-TIESELSKAB and Akielselskabet Dampskibsselskabet Svendborg, d/b/a Maersk Line and Moller Steamship Company, Inc. & Maersk Container Service Company, Inc., Plaintiffs,

v.

BLACK & GEDDES, INC. and Chester B. Salomon, Trustee, Defendants.

Bankruptcy No. 81 B 10399 (PBA).
Adv. No. 81–5629–A.

United States Bankruptcy Court,
S.D. New York.

Jan. 6, 1984.

Haight, Gardner, Poor & Havens, New York City, for plaintiffs; William J. Troy III, Lennard K. Rambusch, New York City, of counsel.

Chester B. Salomon, P.C., New York City, for defendants; Alec P. Ostrow, New York City, of counsel.

## DECISION AFTER TRIAL

PRUDENCE B. ABRAM, Bankruptcy Judge:

On September 28, 1981, the plaintiff-carriers (hereinafter collectively "Maersk") commenced this adversary proceeding against Black & Geddes, Inc. ("B & G"), the debtor, and Chester B. Salomon, as Trustee of B & G (the "Trustee"), seeking to impose a constructive trust in the amount of $38,-265.21 on funds in the hands of the Trustee.[1] On October 28, 1981 prior to answering, the Trustee moved to dismiss the complaint on the grounds that it failed to state a claim upon which relief could be granted. This motion was denied by the court on December 30, 1981, the court finding that the complaint satisfied the minimum pleading standards. *See In re Black & Geddes, Inc.,* 16 B.R. 148 (Bkrtcy.S.D.N.Y.1981).[2] The Trustee was directed to file an answer which he promptly did. The Trustee's amended answer alleges that the relationship between Maersk and B & G, and the Trustee as B & G's successor, was merely that of debtor and creditor, and that there existed no identifiable *res* on which a constructive trust could be imposed. The Trustee also counterclaimed for $3,073.39 in brokerage commissions for services performed by B & G and for $17,865.41 in allegedly preferential pre-petition payments made to Maersk by B & G.

A trial was held on July 14, 1983 at which time both Maersk and the Trustee presented evidence on those matters not agreed to in the lengthy pretrial statement. There are no significant disputed facts, although the legal inferences to be drawn from the facts are subject to differing interpretations.

On February 23, 1981, B & G filed a petition for reorganization under Chapter 11 of the Bankruptcy Code and was continued as debtor in possession. Three months later and on May 27, 1981, the case was

---

1. At trial the amount sought was reduced to $27,594.04.

The complaint in this adversary proceeding was filed prior to the last day for filing claims. This court has held that the complaint of another carrier seeking to impose a constructive trust was barred because not filed prior to the time the Trustee commenced distributions to creditors. *See In re Black & Geddes, Inc. (Associated Container Transportation (Australia) Ltd., et al. v. Black & Geddes, Inc., et al.),* 30 B.R. 389 (Bkrtcy.1983), affirmed on appeal on other grounds, D.C.S.D.N.Y., November 29, 1983 (D.J. Connor).

The court is not aware of any other complaint seeking affirmatively to impose a constructive trust on funds in the hands of the Trustee. However, thirty-six adversary proceedings have been brought by the Trustee against carriers and others seeking to recover alleged preferential transfers. A defense has been raised in those actions, as has been raised to the preference counterclaim in this action, that the monies paid to the defendants were never property of the estate as the monies were subject to constructive trusts in favor of the defendants.

2. The earlier motion was decided by now retired Judge Roy Babitt.

converted to a Chapter 7 liquidation and Mr. Salomon was thereafter appointed the trustee.

B & G was a freight forwarder and had been in business for a number of years. In its capacity as a freight forwarder, B & G arranged for the ocean transport of cargo for various shippers on a number of carriers, including Maersk. It is undisputed in connection with the shipments that are the subject of this adversary proceeding that the shippers paid to B & G the amount of the ocean freight due Maersk, together with B & G's fee for acting as freight forwarder. In accordance with the terms of the bills of lading, Maersk, as carrier, fulfilled its contract of carriage and earned the ocean freight. B & G, however, never made any payment to Maersk for the ocean freight on the eighteen or so shipments involved. All of the monies on which Maersk seeks to impose a constructive trust were received by B & G prior to the filing of the Chapter 11 petition, and no collections made either by B & G as debtor in possession or by the Trustee are in issue. The shippers have not joined as parties in this action.

■ A freight forwarder acts as an intermediary between the shipper and the ocean carrier. The freight forwarder arranges for the ocean transportation by locating available space, handles various documentation for the shipper's goods, including preparation of bills of lading, and performs such other services as arranging for the transport of the goods to dockside. The intermediary role of the freight forwarder is well-recognized in the ocean shipping industry and benefits both the shipper and the carrier. The freight forwarder receives compensation for its services from both the shipper and from the carrier.

"The ocean freight-forwarding industry is a highly important segment of the economy of the United States, in that its functioning makes possible participation in the Nation's foreign commerce by many industries and businesses whose lack of familiarity with the complexities and formalities of exporting procedures might well hinder, or even preclude, such participation if forwarding services were not freely available. * * * 'It can be said * * * that the forwarding industry * * * is an indispensible link between export shippers and the carriers.'" 1961 U.S. Code Cong. & Ad.News 2699, 2700–2701.

■ It appears that freight forwarders, including B & G, are governed by the Shipping Act 1916, 46 U.S.C. § 841b, and are regulated by the Federal Maritime Commission ("FMC"). Charles Clow, a transportation consultant and former chief of the Office of Freight Forwarders at FMC, testified on behalf of Maersk as to the role of the freight forwarder within the industry. Under FMC regulations, a freight forwarder is obligated to pay monies received from a shipper on account of freight charges over to the carrier five days after the ship leaves the port of loading or seven days after receipt of the monies from the shipper, whichever is later. 46 C.F.R. § 510.23(f). However, the freight forwarder is under no obligation to, and does not, turn over to the carrier the actual check received from the shipper, or the exact funds represented by the check.[3] If the freight forwarder fails to pay the carrier within the specified time, it would open itself up to proceedings by FMC to revoke its license. In Mr. Clow's opinion FMC considers the forwarder "... as a fiduciary, handling the monies of other people" and its regulations are directed to assuring that the freight forwarder is financially responsible. Transcript at 60.

---

3. Mr. Clow's testimony is dispositive on this point. On cross-examination the following exchange occurred:
"Q. Mr. Clow, * * * assume * * * that Black & Geddes has income from other sources, not related to the freight forwarding business. They book a shipment on the Maersk Line, they receive the monies from the shipper for whom they booked and they

pay the monies to Maersk Line not from the monies they received from the shipper but from the monies that they had in the bank with respect to their other investments. Is there any difficulty with that?
"A. No, sir. As a matter of fact, there is commingling of those funds, to my knowledge." Tr. at 61–62.

Mr. Clow testified, however, that there is no FMC regulation requiring freight forwarders to segregate the monies received from shippers and he further testified that in his experience freight forwarders do not segregate such monies.

Mr. Robert Mark, the manager of freight collections for Moller Steamship Company, the U.S. general agents for Maersk Lines, testified Maersk extended credit in connection with the ocean freight to the shippers only because the shippers were parties to a shipping conference credit agreement. Transcript at 26 and 49.[4] Maersk did not intend to extend any credit to B & G for the freight charges and, by necessary implication, Maersk did not intend B & G to be liable for the freight in the event the shipper failed to pay. This implication is confirmed by a review of two of the bills of lading introduced at trial, these two being stamped "Due Bill". Plaintiff's Exhibits 1k and 1r. These two bills of lading also bear a rubber stamp legend that the undersigned acknowledges receipt of the bill of lading from Maersk and that if the bill of lading is marked "Prepaid" the freight and other charges are to be paid within fifteen working days. Below the signature lines, which bear signatures assumed to be those of B & G employees, there appears the phrase "authorized to sign for and on behalf of above shipper."

In soliciting cargo for a carrier, it appears that a freight forwarder either arranges for payment by the shipper in advance or verifies that the shipper is a signatory to a shipping conference credit agreement. If, as was the case with the shipments which are the subject of this adversary proceeding, the shipper is a signatory to a credit agreement, the freight forwarder may issue prepaid bills of lading for the cargo, even though the ocean freight has not yet been paid. Two types of shipping conference credit agreements were introduced at trial. There are no significant variations between the two agreements and the following language from one of them is typical:

"In consideration of extension of credit, through the * * * release of prepaid bills of lading * * * to us directly or through the forwarder * * * we [the shipper] * * agree as follows:

"1. Receipts for all bills of lading so issued shall be signed by us or on our behalf by the forwarder * * *.

"2. We [the shipper] will be absolutely and unconditionally responsible to the carriers for payment of all freight and charges due and guarantee that they will be paid irrespective of whether or not funds for payment of such freight and charges have been advanced by us to our freight forwarder or other agent, it being expressly understood and agreed that such forwarder or agent is not the agent of the carrier for the purpose of receiving payment of freight and charges or for any other purpose. All freight and charges shall be paid not later than thirty (30) calendar days after the sailing of the vessel from respective port of loading." Defendant's Exhibit B–1.

B & G deposited all of its receipts, whether freight from shippers, fees earned, rental income or employee loan repayments, into a single bank account known as the freight account. Approximately seven years prior to the time the Chapter 11 petition was filed, B & G established two additional bank accounts: a payroll account and a general ledger account. The payroll and general ledger accounts were funded solely by transfers from the freight account. These two additional accounts were established to aid in managing internal bookkeeping reconciliations as B & G was a substantial operation with eight offices located on the Eastern Seaboard between New York and New Orleans. FMC never objected to the manner in which B & G handled its bank accounts or freight collections.

---

4. "Q. When these freight prepaid Bills of Lading were issued, the ones now in suit, when they were released, on whose credit did you rely in releasing the originals of the Bills of Lading?

"A. [Mr. Mark] We would only release it on the fact that the shipper possessed a conference credit agreement and credit was extended to the shipper." Tr. at 49.

It is agreed that B & G deposited the funds received from the shippers, along with substantial other sums, into the freight account at various times during the several months before the Chapter 11 petition was filed. At the time the petition was filed in this case, the balance in the freight account, and the account to which the funds in the freight account were transferred shortly before the filing, had never dropped below the amount Maersk seeks.

## CONCLUSIONS OF LAW

█ B & G had no independent obligation to Maersk to pay ocean freight for shipments arranged since it never agreed to be liable for the ocean freight. Once B & G received payment from the shipper, B & G became obligated to pay Maersk and a debtor-creditor relationship then arose. B & G did not violate any legal duty to Maersk by failing to segregate the payments received and Maersk cannot impose a constructive trust on any monies now in the hands of the Trustee.

█ Because B & G owed no debt to Maersk until B & G received payment from the shippers, any preference must be measured from the date of receipt of payment. As the record fails to contain evidence as to the date B & G received payment from the shippers, the court cannot decide the matter without a further hearing. Maersk is entitled to offset the commissions it owes to B & G against the debt of B & G to it.

## DISCUSSION

There are numerous cases addressing various aspects of the carrier-freight forwarder-shipper triad. Many of these cases reach apparently inconsistent conclusions. Compare, e.g., *Farrell Lines, Inc. v. Titan Industrial Corp.,* 306 F.Supp. 1348 (S.D.N.Y.), aff'd, 419 F.2d 835 (2d Cir.1969), *cert. denied,* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970); *Koninklijke Nedlloyd Bv. v. Uniroyal, Inc.,* 433 F.Supp. 121 (S.D.N.Y.1977) and *Strachan Shipping Co. v. Dresser Industries, Inc.,* 701 F.2d 483 (5th Cir.1983). The court has concluded that the

confusion initially created by the case law is more apparent than real.

█ Fundamentally the relationship is one of contract and the facts of the contract or contracts made must be ascertained in each case. It appears from a careful review of the cases and of Ullman, *The Ocean Freight Forwarder, The Exporter and The Law* (1967) that the last twenty-five years have been ones of substantial change in the ocean shipping industry, including the introduction and widespread use of containerization. These industry changes have been accompanied by a change in the legal responsibility of the freight forwarder for the ocean freight. Ullman in discussing the earlier cases which held the forwarder liable to the carrier for the freight states that in so holding the courts relied on the forwarder's execution of the due bill. In going on to discuss the conference credit agreements, he states:

"Recently, various steamship conferences operating outbound from the United States have adopted a new procedure which may eventually eliminate or greatly reduce the use of the due bill. * * * [B]ecause of the decisions which relieve a shipper of liability for the freight charges where the forwarder has executed a due bill, the carriers are desirous of changing the relationship so that the liability of the shipper for the freight charges becomes unquestioned, even though the freight may already have been paid the forwarder.

"To accomplish this objective some steamship conferences have proposed a Shipper's Credit Agreement between individual shippers and the conference member lines * * *. Under this procedure the forwarder will not execute a due bill for the ocean freight but merely sign a receipt for the bill of lading. * * *

"It may be seen that the Shipper's Credit Agreement procedure marks a drastic change from traditional practice. Since a forwarder no longer executes a due bill, but only a receipt for the bill of lading, he is no longer undertaking liability for

the freight charges, as the authorities have held." Ullman at 17.

The legal changes discussed by Ullman are well illustrated by *Strachan Shipping Co. v. Dresser Industries, Inc., supra.* The Fifth Circuit reversed the district court and held that a shipper was still liable to the carrier for freight even though the shipper had paid the freight to a now bankrupt freight forwarder. The Fifth Circuit held that the apparent extension of credit to the forwarder was not intended to relieve the shipper in light of the course of dealing of the parties and the totality of the circumstances. Although initial collection efforts were directed at the forwarder, the court found that this was due to an understandable reluctance on the part of the carrier to alienate the forwarder by going behind its back and contracting shippers directly.

> "Yet if the carrier were releasing Dresser [the shipper] and relying solely on Sierra [the freight forwarder], then logically Sierra's name should be on the delinquent list [circulating in the industry]. Also, if the carrier were extending credit to forwarders, then it follows that they would require forwarders to sign credit agreements. Yet these agreements are required of shippers, not forwarders.
>
> \* \* \* \* \* \*
>
> "Lastly, we think that our result comports with economic reality. A freight forwarder provides a service. He sells his expertise and experience in booking and preparing cargo for shipment. He depends on the fees paid by both shipper and carrier. He has few assets, and he books amounts of cargo far exceeding his net worth. Carriers must expect payment will come from the shipper, although it may pass through the forwarder's hands. While the carrier may extend credit to the forwarder, there is no economically rational motive for the carrier to release the shipper. The more parties that are liable, the greater the assurance for the carrier that he will be paid." 701 F.2d 490.

Since it was not at issue in the case, the Fifth Circuit did not address how or when the carrier extended credit to the freight forwarder, which is a central issue in this case.

Maersk has expressly disclaimed any intent to extend credit to B & G. No contract existed between Maersk and B & G, or between B & G and the shipper, which required B & G to segregate funds received from the shipper or which stated the funds were received "in trust." B & G did not execute the due bill and signed only as the shipper's agent. B & G was under no obligation to remit to Maersk, or any carrier, the check received from the shipper or the exact funds represented by the check. The shipper's check also included payment to B & G for its services and expenses. By virtue of FMC rules, once B & G received payment from the shipper, it was obligated to pay the carrier within a specified period of time. This court finds that from the time B & G received payment from the shipper it had a liability to the carrier to pay the freight. Whether this liability derives solely from FMC regulations or also arises as a result of an explicit or implicit contract with, or legal duty to, the shipper or the carrier need not be explored as it has no bearing on the outcome of this case.

There were no facts adduced at trial or stipulated to that in any way differentiated the transactions that are the subject of this action, or their handling, from the hundreds of other similar transactions to which B & G was a party to during the same period. Thus, Maersk's attempt to impose a constructive trust on funds in the hands of the Trustee calls into issue the basic nature of the relationship among a freight forwarder, a shipper and a carrier. Although it is the carrier who is seeking to impose a constructive trust, this court has also considered whether it would make any difference to the outcome of the constructive trust issue if it were the shippers who were the plaintiffs. The court has concluded that it would not.

It is clear that no express trust between either the shippers or the carriers and B & G was created, either generally or specifically, with respect to these or other trans-

actions, although an express trust could have been created without major difficulty. Nor are express trusts generally required in the industry. Instead, the industry has developed practices such as the shipper's credit agreement and has relied on FMC regulation to provide an adequate level of business protection for the transfers of large sums of money via the freight forwarder.

■ It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists. *See In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981); *Chicago Cutter-Karcher, Inc. v. Maley,* 356 F.2d 456 (7th Cir. 1965); *In re Penn Central Transportation Co.,* 328 F.Supp. 1278 (E.D.Pa.1971); *Carlson, Inc. v. Commercial Discount Corp.,* 382 F.2d 903 (10th Cir.1967).

■ On the basis of Mr. Clow's undisputed testimony, the court must necessarily accept for the purposes of this decision that the relationship between the carrier and the shipper on the one hand and the freight forwarder on the other is a fiduciary one. Although the finding of a fiduciary relationship may be a necessary predicate to imposition of a constructive trust, it is not a sufficient condition in and of itself. This court finds no overreaching, fraud, or unjust enrichment. Application of the doctrine of constructive trust is not required by the principles of equity in the context of this bankruptcy case and should not be used to relieve from the results of the conscious business judgment of an industry. Imposition of constructive trust must include a consideration of the relative equities between the proposed trust beneficiary and other creditors. "[An application to impose a constructive trust] is not unlike any other reclamation proceeding, and can only be justified, of course, vis-a-vis the general creditors on the ground that there is an identified *res* to which * * * [the applicant] has a superior equity." *Harvey Brokerage Co. v. Ambassador Hotel Corp.,* 57 F.2d 727, 731 (S.D.N.Y.1932). Maersk's situation is similar to that of the greater percentage of

B & G's creditors. While constructive trust may be available in unique circumstances when a debtor-creditor relationship exists, no special or unique equities have been shown here.

The court has been directed to no reported cases (save the one on the motion to dismiss in this case) dealing with the availability of constructive trust to an ocean carrier (or a shipper) against a bankrupt freight forwarder. There is substantial authority on similar issues in other industries. For example, a long line of cases have considered the rights of a department store licensee against a bankrupt department store to sales receipts turned over by the licensee. The courts have held that a mere debtor-creditor relationship exists even though the department store is obligated to return the receipts on a day certain, less its agreed commission, and even though the license agreement uses words like "in trust", when no actual restrictions have been placed on the department store's use of the funds or on commingling. *See e.g., In re Lord's, Inc.,* 356 F.2d 456 (7th Cir. 1965).

In *In re Penn-Dixie Steel Corp., (Thunderbird Motor Freight Lines, Inc. v. Penn-Dixie Steel Corp.),* 6 B.R. 817 (Bkrtcy.S.D. N.Y.1980), after reviewing the application of the doctrine of constructive trust in the bankruptcy context at length, the court concluded:

"To impress a constructive trust, there must be at least a wrongdoing greater than the nonpayment of a debt. The highest court of the land has so indicated [in *McKey v. Paradise,* 299 U.S. 119, 122–123, 57 S.Ct. 124, 125, 81 L.Ed. 75]." 6 B.R. at 825.

Compare *In re Shulman Transport Enterprises, Inc. (Pan American World Airways v. Shulman Transport Enterprises, Inc.),* 21 B.R. 548 (Bkrtcy.S.D.N.Y.1982) (International air freight forwarder found not to hold freight paid by shippers and consignees in trust for air carrier despite language of cargo agency agreement with result that bank to whom freight receivables had been pledged prevailed); *In re Allbrand Appli-*

ance & Television Co., Inc. *(Allbrand Appliance & Television Co., Inc. v. Merdav Trucking Co.),* 16 B.R. 10 (Bkrtcy.S.D.N.Y. 1980) (No trust relationship existed between debtor and trucker who collected C.O.D. charges for debtor because no understanding that funds were to be kept in a separate and distinct account for the debtor and thus trucker permitted to setoff amount due to debtor for C.O.D. collection against unpaid freight due to it for debtor); and *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981) (Bankrupt travel agent's assets not subject to a trust in favor of air carrier for unpaid ticket sales despite use of word "trust" in contract authorizing ticket sales since there was no provisions for segregating funds or restricting their use and bankrupt not required to transmit proceeds on receipt or demand but only at regular intervals and thus relationship was a debtor/creditor one).

The matter was well stated fifty years ago in *Harvey Brokerage Co. v. Ambassador Hotel Corp., supra,* in which the court imposed a constructive trust on funds in the hands of an equity receiver:

"When A turns over to B some of his property to be sold or evidence of debts owed to him which he wishes to have collected, the presumed intention of both parties is that B is to keep the funds which are proceeds of the sale or of the collection intact and turn them over in due course to A, and not that B may use them for his own purposes and later pay other monies over to A.

"This presumption, which is true because it springs from the common understanding of all men in such relations, may, of course, be rebutted expressly or by implication from agreements between the parties in regard to some incident of their relationship which may be inconsistent with any other construction thereof than that B is to have the use of A's money before he remits it and so is A's debtor merely. If, for example, B is to pay interest to A so long as he retains the money which he has collected for A, or if by a long-established course of dealing between them, or by the custom of the

particular business in which they are jointly participating, B has the right to commingle A's money, when collected, with his own, and use it for his own purposes as would a bank in which A was a depositor and which had collected notes for him, the relation is that of debtor and creditor." 57 F.2d at 729.

*See also Harvey Brokerage Co. v. Ambassador Hotel Corporation,* 1 F.Supp. 660 (S.D. N.Y.1932) (A related case in which the court found no constructive trust.)

The custom of the freight forwarding business and the long-established course of dealing changes and rebuts this "common understanding of all men." B & G had the right to and did commingle the funds with its own, it did not turn over to the carriers the actual funds collected, and it had a specified period of time before payment was required. The testimony of the industry expert, Mr. Clow, makes it clear that this commingling was not a violation of the fiduciary relationship. In fact, it is the commingling which gives rise to the necessity for the various regulations and practices of the FMC and the industry. A mere debtor-creditor relationship exists.

Maersk has pointed out that it is presently the only carrier seeking an affirmative recovery on the basis of constructive trust and has suggested that in light of the uniqueness of the situation the court's focus should be a narrow one. Firstly, as stated above, constructive trust at best in a bankruptcy context, requires consideration of the relative equities of all creditors to the assets in the hands of the trustee. Secondly, Maersk, as well as the defendants in the thirty-six other preference actions have raised a constructive trust argument as a defense to the preference counterclaims. It is asserted by Maersk and the other carriers that they received no preference because the monies paid to them were never property of the estate as those monies were subject to a constructive trust in their favor.

Mere consideration of the problems of proof which would arise suggests the illogicality of the theory. At minimum the court

would be in a massive cross-accounting with each carrier trying to trace "its funds" to the exclusion of other carriers. A day by day, if not hour by hour, analysis of the deposits to and withdrawals from B & G's freight account would be required. Should deposits be deemed available when provisionally credited or only when finally credited? The questions go on and on. However, as the court does not find that a constructive trust should be imposed affirmatively in Maersk's favor or that a preference case be defeated on the grounds that the property of the estate was transferred, it need not reach these difficult tracing questions. See 4 Collier on Bankruptcy ¶ 541.13 at 541–67 (15th ed. 1983).

Both the Trustee and Maersk seem to have assumed in discussing the preference counterclaims that B & G became indebted to Maersk not later than when the bill of lading for the cargo issued. It is undisputed that payment of the freight was made by B & G to Maersk more than 45 days after that date and none of the preference exceptions have been argued. However, this court has concluded as stated above that B & G's liability to Maersk arose only when B & G was paid the amount of the freight by the shipper. The record fails to reflect when the shipper made payment to B & G. If B & G was not indebted to the carrier until payment was received from the shipper, it is entirely possible that there were less than 45 days between the time of receipt of payment from the shipper and payment to the carrier and that one of the defenses may be available.

Were this the only case in which this preference issue had been raised, the court might accept the parties' apparent legal assumption, even though the court views it as erroneous. However, the thirty-six other adversary proceedings seek to recover hundreds of thousands of dollars. A legal determination in this case will necessarily impact on the resolution of those cases and the court reserves the matter pending further hearing.

The Trustee's second counterclaim for $3,073.39 in brokerage commissions has been stipulated by both parties as owing by Maersk. Pursuant to § 553 of the Bankruptcy Code, these commissions may be offset against Maersk's allowable claim against B & G.

As less than all issues are being resolved, the court will give the parties fifteen (15) days to make submissions on the question of whether a partial judgment should be entered at this time.