## In The Matter of The PRATT & WHITNEY COMPANY, INC., Debtor.

## MARWIN PRODUCTION SYSTEMS, LIMITED, Plaintiff,

### v.

## The PRATT & WHITNEY COMPANY, INC., BMY Combat Systems, a Division of Harsco Corporation, Westinghouse Credit Corporation, Defendants.

Bankruptcy No. 2–91–00467.
Adv. No. 91–2091.

United States Bankruptcy Court,
D. Connecticut.

May 12, 1992.

Thomas J. Farrell, and Erin M. Kallaugher, Halloran & Sage, Steven J. Miller, Goodman Weiss Freedman, c/o Halloran & Sage, Hartford, Conn., for plaintiff.

Christopher J. Hug, Robert A. Izard, and Renee B. Allen, Robinson & Cole, Hartford, Conn., for Westinghouse Credit Corp., defendant.

Michael J. Daly, Francis, O'Neil & Del Piano, Hartford, Conn., for John J. O'Neil, Jr., Trustee.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

### ISSUE

The issue presented in this core adversary proceeding is whether the plaintiff, Marwin Production Systems, Limited (Marwin), has established a basis for the imposition on its behalf of a constructive trust on an account receivable due the debtor's estate. John J. O'Neil, Jr., the estate's chapter 7 trustee, filed an appearance in the proceeding but otherwise has not participated. BMY Combat Systems, A Division of Harsco Corporation (BMY), the account payor, did not appear. Westinghouse Credit Corporation (Westinghouse), who intervened in the adversary proceeding as a defendant claiming a perfected security interest in the estate's accounts receivable, denies that the principles of constructive trust apply. It contends that the following background developed at trial establishes only that Marwin is an unsecured creditor of the estate.

## II.

## BACKGROUND

The debtor, The Pratt & Whitney Company, Inc., in 1986 was in the business of designing and manufacturing machine tools with its principal place of business in West Hartford, Connecticut. Marwin, located in England and also a designer and manufacturer of machine tools, wished to expand its sales in the North American market. Discussions along this line ensued between Marwin and the debtor, culminating in the execution, on November 12, 1986, of an untitled document in which Marwin, for a five-year term, granted the debtor "the exclusive right to sell in and jointly manufacture for and sell in the North American market" certain described Marwin products. *Marwin Exhibit* 6 (Agreement).

The Agreement, *inter alia,* provided that the debtor would pay Marwin for all products ordered in pounds sterling at prices set by Marwin; that the debtor not purchase like products from any other source; that the debtor establish "at its sole discretion" a "selling price to its customers"; that Marwin assign one of its employees to the debtor's plant to assist in the marketing of the products; that a "joint name plate" would "be fixed on all Products supplied by Marwin to P & W"; that the debtor be responsible for all ocean freight and insurance to the United States; and that Marwin will warrant to the debtor that all products "manufactured by Marwin shall be free from defects in material and workmanship" for a period of one year after customer acceptance, but that the warranty given by the debtor to customers "will be at the sole discretion" of the debtor. The parties further agreed to "consider an agreement for co-production of the Products in such a manner to best suit the capabilities of Marwin and P & W and competitive market conditions." *Id.*

During 1988, as a result of the joint efforts of the debtor and the Marwin employee located at the debtor's plant, an opportunity arose for a sale of a Marwin product called an Aluminax Vertical Milling and Drilling Machine (Aluminax machine). Marwin and the debtor agreed that Marwin would first manufacture knocked down subassemblies for two Aluminax machines to which the debtor would add certain electrical, software, electronic and other ancillary parts. On June 22, 1988, the debtor alone, despite Marwin's extensive involvement in the negotiations, entered into an "Equipment Purchase Agreement" with BMY, located in York, Pennsylvania, to sell BMY two Aluminax machines for a purchase price of $3,261,730. *Marwin Exhibits* 20 and 21 (BMY sales contract).

The debtor and Marwin shortly thereafter entered into a comparable sales contact for the sale by Marwin to the debtor of the Aluminax machine subassemblies for a sales price of $2,090,123. *Marwin Exhibits* 22 and 32 (Marwin sales contract). The Marwin sales contract provided that Marwin would be paid by the debtor pursuant to the following terms and schedule:

11.7 PAYMENT TERMS
Based on user payments:

|  | USER | MPS | P & W |
|---|---|---|---|
| Payment due at 22 weeks | 45% | 40% | 5% |
| Payment due at 40 weeks | 35% | 15% | 20% |
| Payment due on acceptance at Pratt & Whitney | 10% | 5% | 5% |
| Payment due on acceptance at User | 10 | 5% | 5% |

These figures are based upon the contract value of $3,260,171 against our content of 1,141,722, pounds sterling.

Any variant to these figures would result in the appropriate adjustment.
MPS also acknowledges that late payment by the user would reflect a similar

delay in payment by P & W subject to confirmation that the delay was not caused directly by P & W or its officers or agents.

Marwin and the debtor had negotiated the division of the payments received by the debtor from BMY based on each party's approximate costs and time of cost incurrence—*e.g.*, Marwin's initial work product set at 65% of the total payment with the debtor's later additional work valued at 35%. Thereafter, as work under the two sales contracts progressed, the debtor invoiced BMY, and Marwin invoiced the debtor.

BMY, on January 18, 1989, paid the debtor the initial 45% installment due under the BMY sales contract in the amount of $1,467,077, and the debtor remitted to Marwin the 40% payment due under the Marwin sales contract. On May 8, 1989, BMY paid the second installment of 35% to the debtor, who later sent Marwin a sum slightly less than the agreed-upon 15% payment.

The debtor, on May 24, 1989, entered into a $38,000,000 loan refinancing agreement with Westinghouse in which the parties created a $25,000,000 revolving credit loan against eligible accounts receivable and inventory, a $12,000,000 term loan and a $1,000,000 seasonal working-capital loan. The debtor granted Westinghouse a security interest, *inter alia*, in all accounts receivable. A lockbox arrangement was utilized whereby all of the accounts receivable were deposited at the Connecticut National Bank (CNB) and remitted to Westinghouse. The debtor represented to Westinghouse in the refinancing agreement that it was not engaged in any joint ventures. Marwin denies anyone ever advised it of this refinancing arrangement.

BMY paid the third 10% installment of $326,173 to the debtor on March 30, 1990. Pursuant to the Westinghouse financing agreement, the payment was received at the CNB lockbox and sent on to Westinghouse. The debtor delayed payment of the 5% installment due Marwin. Marwin repeatedly contacted the debtor inquiring why its invoices to the debtor remained unpaid. On May 9, 1990, the debtor's vice president wrote to Marwin stating, in part: "I am aware of the problem our delinquency is causing you at Marwin. I committed to sending you money last week and I was unable. I apologize and I assure you that I will make every effort to make payments as soon as certain critical collections are made here." *Marwin Exhibit* 57. In a facsimile message dated May 9, 1990, Marwin's financial director responded:

Your faxed letter dated May 9th 1990 is not acceptable. All work and support has now stopped, including coercive training course at BMY next week. This position will not change until we have received full settlement of our invoice 1–6857 dated 31st Jan. 1990 for value 43908–89 pound sterling and a firm committment [sic] of when all other outstanding invoices will be paid.

We understand that payment from BMY for this part of the contract has been received by Pratt & Whitney, so why don't you pay us?

We can only assume that Pratt & Whitney have severe financial problems with a danger of going out of business....

*Marwin Exhibit* 58.

In June 1990, the debtor sent a partial payment of the 5% installment to Marwin. On July 3, 1990, the debtor's vice president advised Marwin's chief executive by letter: "I will forward additional payment on your invoices as soon as possible. Money owed now is not being held up by BMY acceptance. Ford shipments for us this month should free up cash for significant payment." *Marwin Exhibit* 60. Marwin's response included the following comment: "Your fax of 3 July 90 sounds encouraging but doesn't tell me when exactly I can expect payments due. Obviously, you have received payment from BMY and have utilised these funds elsewhere." *Marwin Exhibit* 61.

The debtor had received no further BMY installments and had made no additional payments to Marwin at the time it filed its chapter 11 bankruptcy petition on February 14, 1991. On March 18, 1991, the court

converted the debtor's case to one under chapter 7.

Marwin filed its complaint on May 7, 1991 against the debtor and BMY seeking "1. A Declaratory Judgment finding that the [money due from] BMY is not part of the Debtor's Estate" and is due Marwin, and "2. Imposition of a constructive trust in favor of Marwin upon all additional stakeholder monies currently in BMY's possession." The court granted Westinghouse's unopposed motion to intervene as a defendant on July 1, 1991. Thereafter, by mutual agreement, BMY paid over to a trustee account $342,361.70 due the debtor under the BMY sales contract (which sum includes certain extras), to be held pending the final outcome of this proceeding.[1]

Marwin and Westinghouse stipulated at trial that Marwin has neither registered to do business in Connecticut nor made any U.C.C. filings.

Marwin asserts that the debtor has already received more than it is entitled to under the Marwin sales contract. It contends that equitable principles justify the imposition of a constructive trust on the BMY account receivable for all amounts due Marwin from the debtor under the Marwin sales contract, not merely the 5% fourth installment.

### III.

### DISCUSSION

### A.

### *Joint Venture Issue*

Marwin first argues that the arrangement with the debtor for the joint manufacture and sale of the Aluminax machines to BMY amounts to both a joint venture and a principal-agent arrangement, creating fiduciary responsibilities. Westinghouse claims the relationship between those parties, as deliberately structured in the Agreement and the sale documents involved in the sale to BMY, was that of

seller and buyer with no fiduciary implications.

The post-trial memoranda of both Marwin and Westinghouse extensively brief the issue of whether the arrangement between Marwin and the debtor fits within the Connecticut [2] case-law definition of a joint venture. After a careful review of the numerous exhibits introduced at trial, it is apparent that Marwin and the debtor chose not to be specific about the exact nature of their relationship. All relevant documents deal with two sales—one from Marwin to the debtor and the second from the debtor to BMY. One consequence was the limitation of Marwin's liability to BMY, the ultimate customer of the Marwin product. *See, e.g., Westinghouse Exhibit* B (Memo dated July 18, 1990 from Marwin to debtor: "We, MPS, do not have a contract with BMY but you do. This contract includes warranty—what do you propose to do re warranty? Our contract is with P & W not BMY and we do not have warranty responsibilities to BMY."). Another was that BMY had no obligation to pay Marwin any part of the purchase price of the Aluminax machines for which BMY had contracted.

The court concludes that the overall arrangement for the construction and sale of the two Aluminax machines, under the following flexible Connecticut definition, constitutes a form of joint venture. "A joint venture is a special combination of two or more persons who combine their property, money, effects, skill and knowledge to seek a profit jointly in a single business enterprise without any actual partnership or corporate designation." *Electronic Associates, Inc. v. Automatic Equipment Development Corp.*, 185 Conn. 31, 35, 440 A.2d 249 (1981). Marwin and the debtor can reasonably be said to have sought "a profit jointly" through combining their resources to accomplish the sale to BMY.

This conclusion, however, goes but a short way towards determining the dispositive issue of Marwin's entitlement to the imposition of a constructive trust on the

---

**1.** Marwin's post-trial brief states that BMY owes the debtor an additional $60,590.58.

**2.** The Agreement provided that Connecticut law would govern its construction.

BMY receivable. This is because, as set out in section B, *infra*, the presence or absence of a fiduciary relationship is not conclusive on the right to invoke the constructive trust doctrine.

### B.

#### Constructive Trust Issue

The Court of Appeals for this circuit noted in *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir.1989) that Bankruptcy Code § 541(b)(1) excludes from the bankruptcy estate property of others held by the debtor in trust at the time of the filing of the petition; that a constructive trust thereby confers on the trust beneficiary an equitable interest in the trust property superior to that of a bankruptcy trustee; and that state law is to be consulted to determine whether to impose a trust on property.

Connecticut case law on constructive trusts is not extensive, and there are no holdings that the court or the parties have located dealing with circumstances at all similar to those in the present matter. Relying on general statements taken from treatises, Connecticut courts have observed that constructive trusts "arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership, ... [I]t is not indispensable that the conventional relation of trustee and *cestui que trust*, or even *any* fiduciary relation, should exist between the original wrongdoer and the beneficial owner...." (emphasis in original). *Millard v. Green*, 94 Conn. 597, 601–2, 110 A. 177 (1920), quoting Pomeroy's Equity (Vol. 3, 4th Ed.) § 1044 *et seq.* Further, a constructive trust arises "against one, who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds legal title to property which he ought not, in equity and good con-

science, hold and enjoy." *Zack v. Guzauskas*, 171 Conn. 98, 103, 368 A.2d 193 (1976), quoting 76 Am.Jur.2d, Trusts, § 221, p. 446. "[I]t is unnecessary to find fraudulent intent for the imposition of a constructive trust ... [where there is] unjust enrichment of the grantee through his unconscionable retention of the trust res." *Hieble v. Hieble*, 164 Conn. 56, 63, 316 A.2d 777 (1972).

Marwin's central argument for the imposition of a constructive trust on the BMY receivable is that the debtor had only "bare legal title to the [receivable], which it held in trust for Marwin" and "Marwin did not authorize [the debtor] to commingle the BMY payments with its own assets." *Marwin Post–Trial Brief* at 16. Putting aside for the moment whether the record supports Marwin's statement of these facts, Marwin cites no authority for the proposition that commingling of funds by an agent or a co-adventurer is wrongful unless authorized. As noted, there is no Connecticut authority on this issue, but substantial authority exists elsewhere contrary to Marwin's position.

In *In re Monnig's Department Stores, Inc.*, 929 F.2d 197 (5th Cir.1991), one Azad entered into a licensing agreement with the debtor, a department store. The debtor rented space to Azad for the sale of oriental rugs in exchange for a 12% commission. The sales were made in the debtor's name with the debtor required to pay Azad monthly the proceeds less sales tax and the debtor's commission. The licensing agreement did not require segregation of funds, and Azad was aware that the debtor commingled the rug proceeds with other funds. Azad took no action to perfect any lien or claim. The debtor thereafter entered into a revolving loan and security agreement with a lender. After the debtor's bankruptcy, Azad filed an adversary proceeding to impose a constructive trust on proceeds of accounts receivable arising from the Azad rug sales. The court held, that under Texas law, even if a fiduciary relationship existed between Azad and the debtor, there was no wrongdoing other than the nonpayment of a monetary debt and there was no

basis to impose a constructive trust. The court ruled that when the debtor did not agree to establish a special fund for the proceeds of the rug sales, the debtor "assumed a simple contractual obligation to pay Azad." *Id.* at 203. The court noted it was "following the teachings" of *McKee v. Paradise*, 299 U.S. 119, 122–123, 57 S.Ct. 124, 125, 81 L.Ed 75 (1936) (for court to impose constructive trust, there has to be a wrongdoing greater than mere failure to pay a debt). *Id.*

In *In re Morales Travel Agency*, 667 F.2d 1069, 1071–1074 (1st Cir.1981), the debtor was a travel agency selling airline tickets, concededly property of the carrier. The debtor's contract with the carrier stated that monies the debtor collected from ticket sales were to be held "in trust" for the carrier until accounted for. The contract did not require segregation of monies. The court held that no trust existed, despite the use of "talismanic language" and that only a debtor-creditor relationship had been established. *Id.* at 1071. Accordingly, after the debtor filed a bankruptcy petition, the carrier could not prevail over the claim of the bankruptcy trustee. *Cf. In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir.1982).

Two bankruptcy court rulings from the Southern District of New York are in accord: *Thunderbird Motor Freight Lines, Inc. v. Penn–Dixie Steel Corp. (In re Penn–Dixie Steel Corp.)*, 6 B.R. 817, 823–824 (Bankr.S.D.N.Y.1980) *aff'd*, 10 B.R. 878 (S.D.N.Y.1981) (where debtor (shipper) collected money for shipping charges due to carrier, and upon debtor's bankruptcy, carrier asserted constructive trust on such funds, Held: where "recipient of the funds is entitled to use them as his own and can commingle them with his own monies, a debtor-creditor relationship exists, not a trust"); *Dampskibsselskabet AF 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes, Inc.)*, 35 B.R. 830, 836 (Bankr.S.D.N.Y.1984) ("It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists."). *Cf. Yonkers Board of Education v. Richmond Children's Center, Inc.*, 58 B.R. 980, 983 (S.D.N.Y.1986) (where under state statute, state funds forwarded to debtor children's center as "pass-through payment" for purpose of debtor reimbursing local school district for services rendered to nonresident children, such money impressed with constructive trust, notwithstanding debtor commingled state money with debtor's operational funds).

*Penn–Dixie* and *Black & Geddes* both discuss the significance of the constructive trust doctrine in the administration of insolvent bankruptcy estates. It is not uncommon for creditors to seek a priority by establishing that property was obtained under circumstances giving rise to a constructive trust and to remove such property from the estate for the exclusive benefit of the beneficiary. As incisively expressed by Judge Abram in *Black & Geddes, supra* at 836: "Application of the doctrine of constructive trust ... should not be used to relieve from the results of the conscious business judgment of an industry. Imposition of constructive trust must include a consideration of the relative equities between the proposed trust beneficiary and other creditors." *See also BiState Oil Co. v. Heston Oil Co. (In re Heston Oil Co.)*, 63 B.R. 711, 714 (Bankr.N.D.Okl.1986); *Neochem Corp. v. Behring International, Inc. (In re Behring International, Inc.)*, 61 B.R. 896, 902 (Bankr.N.D.Tex.1986).

I conclude, in line with these authorities and under the facts of this proceeding, that no valid basis exists to impose a constructive trust on the BMY receivable in favor of Marwin. The debtor has committed no wrongdoing outside of not paying Marwin. I find that the debtor and Marwin intended that complete, not bare, title to the BMY receivable was to be in the name of the debtor. The parties had contracted that the debtor's obligation to pay Marwin's invoices to it was independent of the debtor's receipt of funds from BMY if any BMY delay in payment was caused by the debtor. While Marwin may not have been informed of the Westinghouse financing arrangement, that lack of knowledge is irrelevant

in that at no time did Marwin require any segregation of the funds the debtor received from BMY. At least as of May 1990, Marwin was aware that the debtor was both commingling the BMY receipts with other funds and, indeed, relying on other collections to pay delinquent Marwin invoices.

In terms of the Connecticut phrasing of the constructive trust doctrine, the debtor breached no fiduciary duty, committed no fraud and did not obtain title to the BMY receivable through unconscionable conduct or the violation of any duty owed to Marwin. As outlined in *Black & Geddes, supra,* the imposition of a constructive trust should not be used to relieve Marwin of a conscious business judgment it made in handling its affairs with the debtor.

## IV.

### CONCLUSION

Marwin is a general unsecured creditor of the debtor's estate. The proceeds of the BMY account receivable are property of the estate, subject only to whatever rights appertain to Westinghouse holding a perfected security interest therein. Judgment will enter for the defendants, John J. O'Neil, Jr., Trustee of the Estate of The Pratt & Whitney Company, and Westinghouse Credit Corporation.